JAMES K. PIERCE AND MADELINE F. PIERCE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1933–69, 3460–69, 5660–69. Filed January 3, 1974.

James K. Pierce, pro se.
*Richard H. Gannon,* for the respondent.

HALL, *Judge:* In these cases respondent determined (a) deficiencies in petitioners' income taxes and (b) liabilities owed by petitioner James K. Pierce as transferee of California Business Service & Audit Co., as follows:

JAMES K. AND MADELINE F. PIERCE, DOCKET NOS. 5660–69 AND 3460–69

| Year | Deficiency | Overassessment |
|---|---|---|
| 1962 | $84, 665. 53 | |
| 1963 | 45, 619. 64 | |
| 1964 | 98, 928. 28 | |
| 1965 | 36, 378. 80 | |
| 1966 | | $18, 255. 42 |
| 1967 | 54, 406. 46 | |
| Total | 319, 998. 71 | 18, 255. 42 |

JAMES K. PIERCE, TRANSFEREE, DOCKET No. 1933–69

| Year | Transferor's deficiency | Sec. 6653(a) penalty |
|---|---|---|
| 1962 | $37, 398. 28 | $1, 869. 91 |
| 1963 | 2, 340. 08 | |
| 1964 | 109, 819. 85 | 5, 490. 99 |
| Total | [1] 149, 558. 21 | [1] 7, 360. 90 |

---

[1] Petitioner does not contest the amount of the taxes and additions thereto owed by California Business Service & Audit Co. in his petition, but contends merely that he is not liable as a transferee of California Business Service & Audit Co.

The issue in docket Nos. 5660–69 and 3460–69 is whether certain withdrawals made by petitioner James K. Pierce from California Business Service & Audit Co. were bona fide loans or constructive dividends. The issue in docket No. 1933–69 is whether petitioner is liable as a transferee for the income tax deficiencies and penalties assessed against California Business Service & Audit Co., the transferor.

### FINDINGS OF FACT

Petitioners, husband and wife, resided in Covina, Calif., when they filed their petitions herein. They filed joint Federal income tax returns for the years in issue in docket Nos. 5660–69 and 3460–69 with the district director of internal revenue at Los Angeles, Calif. Madeline F. Pierce is a party to this proceeding solely because she filed joint returns with her husband, and hereinafter "petitioner" refers only to James K. Pierce.

The alleged transferor, California Business Service & Audit Co. (hereinafter "Company"), was incorporated in California on September 5, 1946. Its business consisted of performing bookkeeping services for its customers. When petitioners filed their petitions herein, Company's principal place of business was Pomona, Calif. Company maintained its books and records on a calendar year. It filed its corporate income tax returns for the years 1962, 1963, and 1964 with the district director of internal revenue at Los Angeles.

Petitioner was one of the founders of Company and was its dominant figure. Petitioner and Wilton B. Kail each owned 50 percent of Company's issued and outstanding stock. Petitioner was Company's executive vice president and chairman of the board of directors, and Kail was its president and a director.

Between 1962 and 1967, Company paid petitioner the following salary, which was reasonable compensation for the services he performed:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1962 | $61, 973. 05 | 1966 | $57. 191. 00 |
| 1963 | 39, 500. 00 | 1967 | 48, 000. 00 |
| 1964 | 37, 745. 80 | | |
| 1965 | 92, 469. 00 | Total | 336, 878. 85 |

Company made numerous advances directly to and on behalf of petitioner in addition to his salary. These loans were recorded on Company's books as "accounts receivable-officers J.K.P." In some years all loans were recorded in the one account, while in other years Company maintained two accounts in petitioner's name, one to record direct loans to petitioner and the other to record payments made on his behalf.

Direct loans to petitioner were made routinely by Company whenever petitioner instructed either his secretary or Company's vice president, Joseph P. Margala, to cause a check to be issued to him and

deposited in his personal checking account. These direct loans were for petitioner's personal use.

Payments made on behalf of petitioner were made by Company whenever petitioner requested that Company issue its check directly to the person to whom petitioner owed money, in discharge of petitioner's personal obligations. Some such payments (as alimony paid petitioner's former wife) were made on a regular basis, while other such payments were made to pay for specific items purchased by petitioner.

Whenever advances were made to petitioner, he promised to repay the sums advanced.

The following schedule reflects the annual net increase in petitioner's loan account for the years listed:

| Year ended | Direct loans | Indirect loans | Total |
|---|---|---|---|
| 1962 | $76,376 | 0 | $76,376 |
| 1963 | 45,977 | $32,349 | 78,326 |
| 1964 | 35,380 | 30,678 | 66,058 |
| 1965 | 6,775 | 48,381 | 55,156 |
| 1966 | 93,667 | 0 | 93,667 |
| 1967 | 217,823 | 0 | 217,823 |
| Total | 475,998 | 111,408 | 587,406 |

This schedule does not take into account three transfers petitioner made to Company in payment of debts. These three transfers, two stocks transfers and the transfer of a residence, are described below.

Sometime prior to 1962, Company expanded its bookkeeping services to many States other than California, forming non-California corporations under the name of Bookkeepers Business Service Co., Inc. Petitioner and Kail owned in equal proportion more than 80 percent of the stock of each such non-California corporation. Offices (or franchises) to carry on a bookkeeping service were established in various cities in the States where Bookkeepers Business Service Co., Inc., corporations had been incorporated. Some of these offices (or franchises) were owned and operated by investors; some were owned by investors and operated by the non-California corporations; some were both owned and operated by the non-California corporations. Petitioner owned the office in Elmhurst, Ill. With the exception of the persons who manned such offices, the non-California corporations had no employees. Other than such offices, the non-California corporations maintained no offices of their own; in all cases, their headquarters were maintained at the main office of Company where the books and records of the non-California corporations were kept and maintained by Company's employees.

Petitioner owned stock in non-California corporations operating in Florida, Indiana, and Illinois, among other States.

On December 31, 1962, petitioner signed a non-interest-bearing note payable to Company within 2 years for $82,842.32. This sum represented the aggregate amount Company had loaned petitioner during 1962. As security for this note, petitioner pledged his 47 shares of stock in the Florida corporation.

On May 20, 1964, petitioner entered into an agreement with Company which recites that petitioner agrees to convey his 22½ shares of stock in the Indiana corporation to Company in full payment of Company's loans made to petitioner during 1962 and 1963 in the aggregate amount of $130,000. This agreement makes no mention of petitioner's note dated December 31, 1962.[2] Kail signed this agreement on behalf of Company. The value of the stock set forth in the agreement was based on a formula agreed to by petitioner and Kail, which formula was in turn based on the actual or potential income from existing and potential franchises in the State. Company customarily bought and sold stock of the non-California corporations on the basis of this formula. The balance sheet of the Indiana company indicated that it had a negative book value. Petitioner did not transfer his Indiana stock to Company until June 17, 1966, at which time Kail signed a receipt on behalf of Company, acknowledging receipt by Company of petitioner's 22½ shares of stock in the Indiana corporation in payment of loans in the total amount of $130,000, all pursuant to the agreement of May 20, 1964. Petitioner's basis in his 22½ shares of the Indiana corporation was $225, and on his 1966 return petitioner reported a $129,775 long-term capital gain as a result of this stock transfer. At the time of the transfer, the fair market value of petitioner's 22½ shares of the Indiana corporation was $130,000.

At the special meeting of Company's board of directors held on June 17, 1966, the directors agreed to accept as substitute security for the $82,842.32 promissory note of December 31, 1962, petitioner's 5 shares in the Illinois corporation together with his interest in the Elmhurst office, all in place of petitioner's 47 shares in the Florida corporation. On this same day, petitioner entered into another agreement with Company which recites that petitioner agrees to transfer his 5 shares of stock in the Illinois corporation along with his interest in the Elmhurst office in full payment of the $82,842.32 promissory note dated December 31, 1962. Kail signed this agreement on behalf of Company. Thereafter, in 1966 petitioner transferred his Illinois corporation stock to Company which credited petitioner's loan account with $40,000. Again petitioner and Kail valued the stock in the non-California corporation in accordance with the previously described formula. Again

2 The record does not disclose the reason for the duplication between petitioner's note dated Dec. 31, 1962, and the May 20, 1964, agreement.

the corporation's balance sheet showed a negative book value. Petitioner's basis in his 5 shares in the Illinois corporation was $50, and on his 1966 return petitioner reported a $39,950 long-term capital gain as a result of this stock transfer. At the time of the transfer, the fair market value of petitioner's Illinois corporation stock was $40,000.

At the same time that he transferred his Illinois stock, petitioner transferred his interest in the Elmhurst office in payment of $42,842.32 of his loans from Company. Petitioner's basis in the Elmhurst office was $14,500, and on his 1966 income tax return he reported a capital gain of $28,392 as a result of this transaction.[3] The Internal Revenue Service accepts petitioner's valuation of the Elmhurst office, but does not accept the valuation of the Illinois and Indiana stock.

On October 15, 1965, petitioner entered into another agreement with Company which recites that petitioner agrees to transfer his interest in a house located at 19712 East Cameron Drive, West Covina, Calif., in payment of $67,357.80 of loans owing Company. This agreement was signed by Kail on behalf of Company. The agreement further recites that the parties agree that the fair market value of the property is $145,000, less a first deed of trust in the amount of $77,642. Company accepted the property subject to the deed of trust. The cost to petitioner of the house equals the stated $145,000 fair market value. The valuation of the house for local property tax purposes in 1965 was $80,000. The Company tried several times without success to sell the house, which stood unoccupied at all times after being transferred to Company. The fair market value of the property transferred to Company in 1965 was $145,000. No gain or loss on the transfer was incurred or reported on petitioners' 1965 tax return.

As noted above, the schedule of annual net increase in petitioner's loan account for the years 1962 through 1967 does not reflect any reduction for the transfer of the Indiana or Illinois stock or the West Covina house. It does reflect a reduction for the transfer of the Elmhurst office.

On January 3, 1966, petitioner signed a 2-year, non-interest-bearing promissory note payable to Company for $156,046.16 (representing the aggregate net balance still owing Company for loans made prior to 1966). This note was never paid.

No interest was ever charged to petitioner on his loans from Company, with the exception of $8,792.78 which was charged to petitioner's loan account at the end of 1967.

With the exception of the sum of $22,000 which was reported by petitioners as a dividend on their 1964 tax return and was recorded as

---

[3] On his 1966 return, petitioner reported his gross sales price as $42,892. The $50 difference is unexplained.

a dividend on the Company's books during 1967,[4] no dividends were paid or declared by Company during the years 1962 through 1967.

Stock sufficient to give Company at least an 80-percent interest in each of the non-California corporations was contributed to Company sometime during December 1967 by petitioner and Kail to enable Company to file a consolidated return. The value of this stock was recorded on Company's books at $25,571.50.

Company also made loans to officer-shareholder Kail, but in substantially lesser amounts. For example, Company's balance sheets for December 31, 1963, 1964, and 1965, show loans to Kail of only $9,052, $2,000, and $49,051, respectively.

The earned surplus of Company as of the end of each of the years in issue as shown on its returns was as follows:

| | | | |
|---|---|---|---|
| 1962 | ($348,117). | 1965 | ($606,330).[3] |
| 1963 | Incomplete return.[1] | 1966 | ($651,802). |
| 1964 | ($359,039).[2] | 1967 | ($317,750).[4] |

[1] However, the return shows a deficit in taxable income of $68,232.
[2] Taken from balance sheet of 1965 amended return showing earned surplus as of Jan. 1.
[3] This figure is from the amended 1965 return.
[4] This figure is from a consolidated return. The deficit in taxable income of Company alone was $274,866.

During all the years in issue, Company suffered from a continued shortage of working capital. Company's three major expenditures for these years were payroll, accounts payable, and payments to and on behalf of petitioner. Company began experiencing difficulty meeting its payroll in 1966. On about July 26, 1966, the payroll was delayed a day because Company lacked sufficient cash to pay it. Moreover, during this period a few payroll checks were dishonored for lack of funds. In addition, Company was traditionally slow in paying its accounts payable. Nonetheless, Company continued to make loans to petitioner in return for petitioner's promise to repay them.

On its 1968 tax return, Company claimed a $550,385 business bad debt deduction for the outstanding unpaid loans it had previously made to petitioner.

On September 30, 1968, Company filed a petition under chapter XI of the Bankruptcy Act in which it alleged that it was unable to pay its debts when due and reported a cash deficit of $412,271.

The loans made by Company to and on behalf of petitioner during the years 1962 through 1967 were bona fide loans and were made for a fair consideration.

[4] We conclude from the record before us that in fact there were no earnings and profits in either year out of which a dividend could have been declared.

OPINION

### 1. *Constructive Dividend Issue*

The first issue is whether certain amounts advanced to petitioner by Company during the years 1962 through 1967 were loans as petitioner contends or constructive dividends, as respondent asserts.

Whether Company's advances to petitioner, which were carried on Company's books as accounts receivable, were bona fide loans is a factual question and depends upon the existence of an intent on petitioner's part to repay at the time the advances were made, and the intent on the Company's part to enforce the obligations. *Chism's Estate* v. *Commissioner*, 322 F. 2d 956 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; *Clark* v. *Commissioner*, 266 F. 2d 698, 710–711 (C.A. 9, 1959), affirming and remanding a Memorandum Opinion of this Court; *Electric & Neon, Inc.*, 56 T.C. 1324 (1971), on appeal (C.A. 5, Sept. 7, 1973) ; *Jack Haber*, 52 T.C. 255 (1969), affirmed per curiam 422 F. 2d 198 (C.A. 5, 1970) ; *Jacob M. Kaplan*, 43 T.C. 580 (1965), appeal dismissed (C.A. 2, 1966). The disposition of this issue turns upon a consideration and weighing of all the facts and circumstances. *Elliott J. Roschuni*, 29 T.C. 1193, 1201–1202 (1958), affirmed per curiam 271 F. 2d 267 (C.A. 5, 1959), certiorari denied 362 U.S. 988 (1960).

Unfortunately in this case petitioner, who is not a lawyer, is representing himself because he lacks funds with which to hire counsel. Not being a lawyer, petitioner was wary of entering into stipulations of fact the legal consequences of which he could not predict. Moreover, the records reflecting the transactions involved belonged to the transferor and apparently were not available to either petitioner or respondent prior to the call of the trial calendar at which time a subpoena duces tecum issued. Consequently, the Court is faced with a protracted and jumbled record, replete with inconsistencies, which is, in addition, not nearly as complete as it might be. We have been required to piece together the facts, giving weight to petitioner's oral testimony on several crucial points. "Taking into account the fact that petitioner appeared on his own behalf, that he is not a lawyer, and that we were impressed with his candor and credibility," [5] we find that the advances made to petitioner during the years in issue were bona fide loans, and not constructive dividends or distributions with respect to his stock in Company, for the reasons stated hereafter.

To begin with, petitioner testified that at all times he expected to repay all amounts advanced to him by Company. This testimony was corroborated by Kail, the other 50-percent shareholder of Company

---

[5] *Max Carasso,* 34 T.C. 1139, 1143 (1960), affd. 292 F. 2d 367 (C.A. 2, 1961), certiorari denied 369 U.S. 874 (1962).

and its president, who stated he believed that petitioner would repay the loans and could do so because petitioner was a very strong man who had built Company from nothing into a business with over 100 offices.

Second, the advances Company made to petitioner were recorded on Company's books as accounts receivable and some were evidenced by notes. On two separate occasions, petitioner signed a 2-year noninterest-bearing note for the aggregate sum due Company on the date of the note. One of the two notes was secured by stock petitioner owned in another company.

Third, petitioner made three substantial repayments to Company. Petitioner paid the secured note for $82,842.32 in full in 1966 by transferring to Company certain stock and the Elmhurst office, and petitioner reported the gain on this exchange in his 1966 tax return. By written agreement between petitioner and Company dated May 20, 1964, petitioner acknowledged he then owed Company $130,000 and agreed to repay it by conveying certain other shares of stock to Company. This he did in 1966, and again he reported the gain from the transaction on his 1966 return. Petitioner made one other payment with respect to his loans from Company. He conveyed a house to Company in 1965 which satisfied $67,357.80 of petitioner's loans from Company.[6]

Fourth, one common characteristic of distributions with respect to stock is the direct correspondence that they bear to the various percentages of stock holdings. *Jack Haber, supra* at 267. However, here loans made to petitioner, a 50-percent shareholder, far exceeded loans made to Kail, also a 50-percent shareholder.

Fifth, another common characteristic of distributions made with respect to stock which are disguised as loans is the existence of earnings and profits. See *Jack Haber, supra* at 267–268; *Victor Shaken*, 21 T.C. 785, 793 (1954); cf. *Jacob M. Kaplan, supra.* According to respondent's deficiency letter, Company had earnings and profits. However, according to Company's tax returns, which are in evidence, Company had a deficit earned surplus in every year in issue.[7] On the evidence presented we have found as a fact that Company had a deficit in earned surplus for all the years in issue, and therefore conclude, for the purposes of this case, that Company also had a deficit in earnings and profits for all years in issue.

---

[6] The local tax bill itself, valuing the house at $80,000 for property tax purposes, was not introduced into evidence. This Court has held previously that a value placed upon property for the purpose of local taxation, unsupported by other evidence, cannot be accepted as determinative of fair market value for Federal income tax purposes in the absence of evidence of the method used in arriving at that valuation. *Helen D. Emmet*, 11 T.C. 90, 95 (1948); *Helen Barclay, Executrix*, 4 B.T.A. 1139, 1141 (1926).

[7] In at least 3 of the years in issue, respondent assessed taxes against Company which petitioner, as alleged transferor of those taxes, does not contest. However, the basis for the assessments, and the effect thereof on Company's earned surplus account does not appear from the record.

Thus, on the basis of the facts before us, and recognizing that the question is a close one, we hold that Company's advances to petitioner were bona fide loans and not constructive dividends or distributions made with respect to petitioner's stock in Company.

## 2. Transferee Issue

The second issue in this case is whether petitioner James K. Pierce is liable as a transferee under section 6901(a)[8] for the income tax deficiencies and penalties assessed against California Business Service & Audit Co., the transferor. Petitioner does not contest the amount of the taxes and additions thereto owed by California Business Service & Audit Co., but contends merely that he is not liable as a transferee of the Company.

Section 6901(a) provides a summary remedy for the enforcement of respondent's position as a creditor. *Coca-Cola Bottling Co. of Tucson* v. *Commissioner*, 334 F. 2d 875, 877 (C.A. 9, 1964), affirming 37 T.C. 1006 (1962). The definition of a transferee for purposes of section 6901(a) is a question of State law. *Commissioner* v. *Stern*, 357 U.S. 39 (1958). Under California law, which is applicable in this case, a person is liable as a transferee to the extent of the value of transferred assets when such assets are fraudulently conveyed to him. Cf. *Kuzmicki* v. *Nelson*, 101 Cal. App. 2d 279, 225 P. 2d 233 (Dist. Ct. App. 1950).

Respondent in his brief states:

Speaking objectively, there is only one question which, if answered in the negative, might defeat transferee liability: Assuming that Pierce ever promised to repay the alleged "loans," whether his promise, without more, qualified as "fair consideration" or "good faith fair equivalent" as defined in Cal. Civ. Code § 3439.03. The respondent contends that a mere promise to repay a loan of money is not a "fair equivalent" for the money so loaned—when the loan so reduces the transferor's cash position that it is unable to pay its debts when due.

The respondent admits that the California cases are not clear. * * *

In 1939 California adopted the Uniform Fraudulent Conveyance Act, now found at Cal. Civ. Code secs. 3439. through 3439.12 (West 1970). Cal. Civ. Code sec. 3439.05 provides that any conveyance made by a corporation engaged in business, *without fair consideration*, which reduces the corporation's capital to an unreasonably small amount is fraudulent as to creditors without regard to actual intent. Cal. Civ. Code sec. 3439.04 provides that any conveyance made *without fair consideration* is fraudulent as to creditors, without regard to actual intent, if the transferor was either "insolvent" at the time of the transfer or was rendered "insolvent" by the transfer. Cal. Civ.

---

[8] All section references are to the Internal Revenue Code of 1954, as in effect in the years in issue, unless otherwise indicated.

Code sec. 3439.02 states that a person is insolvent when a sale of his assets would not realize sufficient cash to satisfy his liabilities. And Cal. Civ. Code sec. 3439.03 defines "fair consideration" as follows:

Fair consideration is given for property, or obligation:

(a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

(b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

The question we must decide is whether petitioner's naked promise to repay the sums advanced to him can qualify as a "fair consideration," a "good faith equivalent," or a "present advance" under the Act. Unfortunately, California courts have never ruled on this precise issue.

In general, what constitutes "fair consideration" under the Act must be determined from the standpoint of the creditors. *Hansen* v. *Cramer*, 39 Cal. 2d 321, 245 P. 2d 1059 (Sup. Ct. 1952) ; *Patterson* v. *Missler*, 238 Cal. App. 2d 759, 48 Cal. Rptr. 215 (Dist. Ct. App. 1965) ; *Bailey* v. *Leeper*, 142 Cal. App. 2d 460, 298 P. 2d 684 (Dist. Ct. App. 1956). Gross disparity in the value of the items exchanged will cause the California courts to set the transfer aside as fraudulent within the meaning of the Act. *Stearns* v. *Los Angeles City School District*, 244 Cal. App. 2d 696, 53 Cal. Rptr. 482 (Dist. Ct. App. 1966). Seemingly, almost anything of sufficient value can be received as "fair consideration."

Although the specific question as to whether a naked promise to pay is "fair consideration" within the meaning of section 3439.03 has never been considered by the California courts, the problem has arisen in other jurisdictions which have enacted the Uniform Fraudulent Conveyance Act. New Jersey enacted the Act in 1919, adopting the relevant sections verbatim. N.J. Rev. Stat. secs. 25 :2–8—25 :2–11 (1937). In *Hollander* v. *Gautier*, 114 N.J. Eq. 485, 168 Atl. 860 (1933), the Court of Chancery of New Jersey declared in broad language that an enforceable promise to pay a nonspecified amount of money made at the time of transfer is fair consideration within the meaning of the Act. This conclusion was reached by following the holding in the Minnesota case of *Schlecht* v. *Schlecht*, 168 Minn. 168, 209 N.W. 883 (1926), where an enforceable promise to provide labor and materials was held to be adequate under the Minnesota version of the Uniform Act, enacted verbatim in relevant sections by Minnesota in 1926. Minn. Stat. Ann. secs. 513.21–513.24 (1947). In *Freitag* v. *The Strand of Atlantic City*, 205 F. 2d 778 (C.A. 3, 1953), the New Jersey Act was again construed. Relying on both *Schlecht* and *Hollander* the Court of Appeals for the

Third Circuit declared that "an executory promise may be very valuable. It may be 'property' and 'fair consideration' within the meaning of the Act." 205 F. 2d at 784.

In *Hay* v. *Duskin*, 9 Ariz. App. 599, 455 P. 2d 281 (1969), the Court of Appeals of Arizona held that a promise of future legal services is fair consideration within the meaning of the Arizona version of the Uniform Act, identical in relevant sections to the California statute. Ariz. Rev. Stat. Ann. secs. 44–1002—44–1005 (1969). This view comports with that of the Supreme Court of New Hampshire in *Osgood* v. *Massachusetts Mut. Life Ins. Co.*, 93 N.H. 160, 37 A. 2d 12 (1944), where the New Hampshire version of the Act, N.H. Rev. Stat. Ann. secs. 545:2–545:5 (1955), identical in the relevant sections, was read to allow an annuity purchased from an insurance company to qualify as "fair consideration" despite the fact that an annuity is a promise to make periodic payments.

But not all of the States which have adopted the relevant portions of the Uniform Act are in agreement. Wisconsin and South Dakota courts have reached the opposite conclusion. *Running* v. *Widdes*, 52 Wis. 2d 254, 190 N.W. 2d 169 (1971); *Village of West Milwaukee* v. *Bergstrom Mfg. Co.*, 242 Wis. 137, 7 N.W. 2d 587 (1943); *Angers* v. *Sabatinelli*, 235 Wis. 422, 293 N.W. 173 (1940); *Virgil State Bank* v. *Wahl*, 56 S.D. 318, 228 N.W. 392 (1930); *Hulsether* v. *Sanders*, 54 S.D. 412, 223 N.W. 335 (1929).

The commentators, like the courts, do not agree. James Angell McLaughlin, a noted expert in the bankruptcy area writes that "An executory promise is not a fair consideration according to the unequivocal language of [the Act]," admitting however that "this does not seem to have been given full effect in the cases." McLaughlin, "Application of the Uniform Fraudulent Conveyance Act," 46 Harv. L. Rev. 404, 414 (1933). He labels *Schlecht* as "clearly erroneous" (*id.* at 447, fn. 215), and cites *Hulsether* with approval (*id.* at 414, fn. 51). Writing under the names James Angell MacLachlan, Professor McLaughlin reiterated this view in his treatise, Handbook of the Law of Bankruptcy, sec. 238, p. 273 (1956). See also Cowans, Bankruptcy Law and Practice, sec. 759, p. 407 (1963).

A more flexible approach, however, is advanced in 4 Collier, Bankruptcy, sec. 67.33, pp. 510–512 (14th ed. 1971):

it has been held under the Uniform Act that promises to support the transferor and even to discharge his obligations do not constitute fair equivalents. On the other hand, several cases have held executory promises to be sufficient. In some of these, the courts calculated the worth of the promises by adding up expenditures pursuant thereto. This procedure would seem to be at war with the notion expressed earlier that the fairness of the consideration must be determined as of the time of the transfer. Where the thing promised cannot be beneficial or of

avail to the creditors, an executory promise is certainly to be condemned. Where, however, the promisor is solvent and the promise is enforceable, it seems doubtful that a transfer to him in exchange for his promise should be held to be necessarily and automatically without fair consideration * * * [Fns. omitted.]

We conclude that the majority and better view is that a bona fide enforceable promise to pay money in the future may constitute "fair consideration" under the Uniform Act. Such a promise, while as subject to subsequent diminution in value as any other asset which has value when transferred, is clearly an asset on which a creditor can levy, and if, due to the promisor's financial condition, it provides the transferor with a sufficient quid pro quo when given, the fact that later events may deprive the promise of value should be of no greater significance than the fact that corporate stocks, for example, may also later become worthless. The test should be value when given, not the exercise of hindsight. See MacLachlan, Bankruptcy, sec. 236, pp. 271–272 (1956). Accordingly, we hold that a bona fide promise constitutes "fair consideration" within the meaning of the California statute.[9] This conclusion of law leads us to the question whether petitioner's promise—*when made*—was bona fide and of sufficient value.

The burden of proof is upon respondent to prove that petitioner is liable as a transferee in this proceeding. Sec. 6902(a). Respondent has not shown that petitioner's promises when given were of insufficient value to support the transfer. We have therefore found as a fact that the loans made by Company to and on behalf of petitioner during the years 1962 through 1964 were bona fide loans and were made for a fair consideration. We therefore hold that petitioner is not a transferee of Company and is not liable for its taxes and additions thereto.

### 3. *Miscellaneous Determinations*

In the statutory notices of deficiency in docket Nos. 5660–69 and 3460–69, respondent made numerous determinations in addition to the constructive dividend issue regarding petitioners' individual tax liabilities for the years 1962 through 1967 (exclusive of 1966). Petitioners introduced no evidence relating to these determinations. Since the burden of proof pertaining to these determinations rests with petitioners (Rule 142, Tax Court Rules of Practice and Procedure), we have no choice but to sustain respondent's determinations contained in the statutory notices of deficiency with the exception of the constructive dividend issue.

*Decisions will be entered under Rule 155.*

---

[9] We note that the California Supreme Court has generally been solicitous of debtors' rights in recent years. See, e.g., *Blair* v. *Pitchess,* 5 Cal. 3d 258, 486 P. 2d 1242, 96 Cal. Rptr. 42 (Sup. Ct. 1971), and *Randone* v. *Appellate Dept. of Sup. Ct. of Sacramento Co.,* 5 Cal. 3d 536, 488 P. 2d 13, 96 Cal. Rptr. 709 (Sup. Ct. 1971).