MICHAEL S. WASNICK, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wasnick v. Commissioner
Docket No. 36098-83.
United States Tax Court
T.C. Memo 1985-589; 1985 Tax Ct. Memo LEXIS 42; 51 T.C.M. (CCH) 34; T.C.M. (RIA) 85589; December 4, 1985. Michael Waris, Jr. and Bertrand M. Harding, Jr., for the petitioner. Robert F. Geraghty, for the respondent. *43 FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Year
Deficiency
1979
$20,220
1980
$17,624
1981
$60,983
In an amended answer, respondent alleged, alternatively, that petitioner is liable for the following income tax deficiencies for the same years: Year
Deficiency
1979
$20,220
1980
$ 233
1981
$79,279
The parties have stipulated to the disposition of certain issues, [1] and the only issue remaining for decision is whether petitioner's net withdrawals of funds from his wholly owned corporation, Chief Construction Company, Inc., during 1979, 1980, and 1981 were tax-free loans or distributions taxable to him under sections 301[2] and 316. There is a subsidiary issue as to whether a $100,000 loan in 1980 was made to petitioner or to the corporation and, if to petitioner, whether he had taxable income when the corporation repaid the loan in 1981. *44 FINDINGS OF FACT General
When he filed the petition in this case, petitioner's legal residence was Seattle, Washington. Petitioner timely filed Federal income tax returns for 1979, 1980, and 1981. In 1956 to 1959, petitioner worked as a commercial fisherman in Alaska during the spring and summer months and sold automobiles during the winter. From 1960 through 1964, petitioner engaged in the construction and sale of houses through a corporation named Regal Construction (Regal). During at least a part of this latter period, petitioner's father participated in the business with him. In 1964, all of Regal's houses were sold and its business was liquidated. Chief Construction Company
After liquidating Regal, petitioner worked first as a construction laborer and later as a supervisor of construction, receiving as compensation for his services a share of the profits from the construction and sale of homes. In September 1966, petitioner went back into the home building business with his father and operated through a corporation named Chief Construction Company (Chief). The business was incorporated on the recommendation of Gerald H. Shaw (Shaw), a certified public *45 accountant who later supervised Chief's bookkeeping and other accounting records. Chief adopted a fiscal year ending March 31. From the date of Chief's incorporation on September 29, 1966, to December 19, 1977, when petitioner's father died, petitioner and his then wife owned 50 percent and his father and mother owned 50 percent of Chief's stock. After his father's death, petitioner and his then wife, under a redemption agreement, became owners of all of the stock and held it until October 23, 1979. At that time, Chief redeemed the community one-half interest of petitioner's then wife in connection with the dissolution of their marriage. Petitioner held 100 percent of the stock from October 23, 1979, until January 2, 1980, when Lenes Rasmussen (Rasmussen), an employee of Chief, acquired 25 percent of Chief's stock. Chief reacquired Rasmussen's stock on March 31, 1982, leaving petitioner, again, as its sole shareholder. Petitioner served as Chief's president from its incorporation at least until March 31, 1984. As president of Chief, petitioner's initial duties included locating land, working with lenders to obtain financing for lot purchases and construction, obtaining bids *46 from contractors, and supervising construction. Petitioner was required to have a working knowledge of Chief's financial statements. Petitioner's father served as secretary-treasurer of Chief from its incorporation until his death in 1977. His duties included mainly general oversight and business advice. Chief had several key employees and advisors. To assist in supervising construction, Chief employed Rasmussen in 1969 and he continued to work for the company until 1982. Beverly Southern (Southern) was employed as Chief's bookkeeper, secretary, and general assistant from August 1974 until June 1, 1984, when she retired. Southern kept the corporate books, posted the ledgers, and performed other day-to-day office work. From 1966 to mid-1981, Shaw provided general accounting advice, prepared Chief's periodic financial statements, served as Chief's outside financial and tax advisor, and prepared Chief's as well as petitioner's income tax returns. Because of his long-term relationship with the Wasnick family, Shaw felt that he had a moral obligation and responsibility to ensure that Chief's financial position and accounting records were preperly maintained. In the summer of *47 1980, petitioner and Shaw "agreed to disagree" over the handling of Chief's business. During the period from late 1980 forward, Shaw had few, if any, direct communications with petitioner with respect to corporate affairs. John Koenes (Koenes), a certified public accountant, became Chief's accountant in late 1981. He prepared Chief's financial statements for the periods ended March 31, 1982 and March 31, 1983, and its tax returns for those periods and for the period ended March 31, 1984. Koenes prepared petitioner's income tax returns for 1981, 1982, and 1983. Koenes also assisted petitioner in connection with the Internal Revenue Service audit of Chief's and petitioner's income tax returns involved in this proceeding. For its fiscal years ended March 31, 1973 through March 31, 1975, Chief reported losses totaling $151,111, which it carried forward into later years. Chief's taxable income and losses, before reduction for the net operating loss carryovers from prior years were as follows: Fiscal Year March 31
Taxable Income (Losses)
1977
$ 28,646 1978
$ 10,469 1979
$ 126,924 1980
$ 75,113 1981
$ 6,959 1982
$ 95,667 1983
$ (48,347)
1984
$ (65,495)
*48 Chief has never declared or paid dividends to its shareholders. General Ledger Account No. 211
In keeping with the usual practice of closely held businesses, Shaw set up an account, designated as General Ledger Account No. 211 (GL Account 211), to record the payment by Chief of some of petitioner's personal bills and obligations as well as his cash withdrawals. Amounts that were paid by Chief and charged to GL Account 211 were not deducted on its tax returns as business expenses. In performing her bookkeeping duties, Southern determined which payments pertained to Chief's business and which payments were personal to petitioner. In some instances, petitioner would write a check on Chief's account and initial the stub so that Southern would know the money was for his personal use. In such cases, Southern recorded the withdrawl in GL Account 211 by writing the word "drew" in the margin. She charged what she thought were personal expenses to petitioner's GL Account 211. If she was in doubt as to the nature of the expenditure, she consulted petitioner or Shaw. A similar account, designated as General Ledger Account No. 210, was maintained for petitioner's father up *49 to his death. At the close of each of Chief's fiscal years ended prior to March 31, 1977, GL Account 211 for petitioner showed debit or credit balances of relatively small amounts. As of March 31, 1977, GL Account 211 showed a balance due of $30,307. Beginning with the fiscal year ended Marchd 31, 1978, GL Account 211 showed the following debit (i.e., net withdrawal) balances on March 31, the end of Chief's fiscal year, and December 31, the end of petitioner's accounting period, through December 31, 1983: Year
March 31
December 31
1978
($ 33,409.25)
($ 86,423.09)
1979
($ 75,810.79)
($114,909.79)
1980
($ 32,142.37)
($ 82,791.29)
1981
($147,114.86)
($208,265.39)
1982
($497,283.07)
($550,151.74)
1983
($514,906.01)
($746,448.23)
As of March 31, 1984, the debit balance of GL Account 211 was $779,799. The debit balance of GL Account 211 on December 31, 1981, did not reflect Chief's repayment on July 1, 1981, of a $100,000 loan from Laurel Johnson (Johnson) or petitioner's withdrawal on September 18, 1981, of $154,522 from Chief's account at Washington Mutual Savings Bank. Both of those amounts were debited to GL Account 211 as of March 31, 1982, and *50 are more fully described below. The debit balances for GL Account 211, set forth above, remained after giving petitioner the benefit of the following payments or credits: Year
Month of Payment
Amount
1979
January
$ 435.00
March
155.75
March
95.00
March
16,634.84
(bonus)
May
5,000.00
August
10.57
November
5,000.00
December
6,000.00
(bonus)
1980
January
80,000.00
March
20.00
March
214.00
March
12,000.00
(bonus)
April
20,000.00
June
12,000.00
(bonus)
1981
March
893.70
March
100.00
March
1,393.70
August
32.00
September
229.51
September
1,096.00
October
7,500.00
December
19,500.00
(bonus)
Total Credited Payments
$188,310.07
The $80,000 credit in January 1980 and the $20,000 credit in April 1980 were derived from the loan from Johnson which, as indicated above, is discussed later in these findings. Also, a number of the credited items represent refunds of amounts previously debited, offsetting entries, and other adjustments. The entries in GL Account 211 show that withdrawals were made to cover a variety of petitioner's expenditures. A substantial portion of the *51 withdrawals was in the form of cash ($27,844 in 1979; $15,920 in 1980; $186,042.89 in 1981, including the Washington Mutual Savings Bank withdrawal ($154,522) discussed below). The sum of $23,579.21 was used in October 1980 to remodel a residence at 20013 3rd West. Some $54,302.67 ($44,302.67 and $10,000) in March 1981 and $30,823.49 in October 1981 were withdrawn to cover the cost of remodeling petitioner's residence at 1017 S. W. Normandy Terrace. Still other amounts were used to cover doctor bills, some of the expenses of petitioner's divorce, golf club dues, taxes, and other personal items. Trading in Commodities
During the period from October 1979, through March 1981, Chief maintained accounts with various investment companies through which it made investments in commodities. Initially, Chief invested in interest sensitive commodities, such as T-Bills and T-Bonds. Later, however, Chief expanded its trading into other commodities. Chief reported losses from trading in commodities in the amounts of $309,029 in its fiscal year 1980 and $216,017 in its fiscal year 1981. In the summer of 1980, Shaw had disagreements with petitioner over his management of Chief's business, *52 particularly the use of its funds for commodity trading, and those disagreements led to Shaw's termination of his relationship with Chief. Rasmussen also objected to the use of Chief's funds for commodities trading. In addition, financial institutions threatened withdrawal of credit which was essential to the home construction business. As a result of these objections, petitioner caused Chief to cease trading in commodities in March 1981. Beginning in Approximately August 1981, petitioner began investing in commodities through a trading account maintained in his own name with certain investment companies.Although petitioner had no money of his own and his GL Account 211 had a debit balance of approximately $180,000, he proceeded to make numerous withdrawals of Chief's funds for commodity trading. Petitioner's income tax returns for 1981 and 1982 show losses from such trading totaling $158,323 and $215,870, respectively. On September 18, 1981, petitioner withdrew $154,522.89 from Chief's savings account at Washington Mutual Savings Bank and, to cover losses, deposited the funds in a commodity trading account maintained in his name at an investment company. At that time, petitioner *53 did not report the withdrawal to anyone in Chief's management with the result that Chief's financial statements for periods ended September 30, 1981, and December 31, 1981, incorrectly listed the withdrawn amount as an asset in the form of a deposit with Washington Mutual Savings Bank. Southern discovered that the money had been withdrawn from Chief's savings account, called the withdrawal to petitioner's attention, and ultimately on her own initiative charged it to GL Account 211 as of March 31, 1982. Laurel Johnson Loan
At the close of Chief's fiscal years ended March 31, 1977 and March 31, 1978, Shaw recommended that petitioner execute promissory notes covering the increase in petitioner's GL Account 211, and petitioner did so. At the close of the fiscal year ended March 31, 1979, Shaw again recommended that petitioner execute a promissory note to cover the substantial increase in GL Account 211 during the preceding year but petitioner declined to do so, stating that he would endeavor to pay the account by outside borrowing. On December 17, 1979, petitioner, signing for Chief, executed a second mortgage to Johnson stating that it was given to secure payment of a promissory *54 note of that date in the amount of $250,000. The mortgage covered Chief's interest in real property known as the Lake Easter Addition. Chief did not execute a note to Johnson dated December 17, 1979. On January 28, 1980, petitioner arranged a loan from Johnson in the amount of $100,000. Johnson, a retired businessman and friend of petitioner, had earlier loaned Chief $100,000 on August 20, 1979, and $50,000 on December 15, 1979, and those loans remained unpaid as of January 28, 1980. The promissory note evidencing the January 28, 1980, loan was signed first by "Chief Const. Co., Inc., Mike S. Wasnick (Pres.)" and second by "Mike S. Wasnick Personally." The note called for interest of 15 percent payable quarterly. To secure the repayment of the note, petitioner named Johnson as beneficiary of a $100,000 insurance policy that he took out on his own life. The loan proceeds were paid in the form of a $100,000 check payable to petitioner. Chief did not carry the note on its books as its obligation. All of the interest payments on the note were made by funds belonging to Chief and were debited to GL Account 211. On July 8, 1981, Chief sold its interest in Lake Easter Addition *55 and from the proceeds repaid Johnson $250,000: $150,000 with respect to the notes dated August 20, 1979 and December 15, 1979, respectively, and $100,000 with respect to the note dated January 28, 1980. At Shaw's instruction, Southern charged the $100,000 repayment of the January 28, 1980, loan to a suspense account until she made the closing entries for the fiscal year ended March 31, 1982. She posted the $100,000 loan repayment to GL Account 211 at that time. Internal Revenue Service Audit
In March 1982, the Internal Revenue Service began an audit of Chief's income tax returns for the fiscal years ended March 31, 1980 and March 31, 1981, and petitioner's income tax returns for 1979, 1980, and 1981. During the course of the examination of petitioner's returns, the revenue agent asked Koenes if there were any notes to support petitioner's claim that his net withdrawals represented loans. Koenes in turn asked petitioner if there were such notes and he replied that there were none. Koenes told petitioner that he would like to have such notes and related corporate minutes. Thereafter, sometime between September 1, 1982 and December 31, 1982, petitioner had his attorney prepare *56 interest-free demand notes and corporate minutes purporting to evidence the authorization and the making of loans as follows: Date
Amount
May 13, 1979
$51,502
June 8, 1980
$28,489
June 9, 1981
$32,205
In response to an inquiry from the revenue agent, petitioner's attorney acknowledged in a letter dated September 21, 1983, that the three promissory notes had been prepared after the loans were made and after the Internal Revenue Service investigation was initiated. Following the audit, a notice of deficiency was mailed to petitioner determining that, based on the withdrawals of funds through GL Account 211, petitioner received dividends from Chief for 1979, 1980, and 1981 as follows: Year
Amount
1979
$39,570
1980
$23,073
1981
$70,642
In addition, in the notice of deficiency, respondent determined that the withdrawals exceeded corporate earnings and profits and that petitioner received income in the form of capital gains in the amounts of $9,769 for 1980 and $31,413 for 1981. In making these determinations, respondent treated the $100,000 loan of January 28, 1980, from Johnson as having been made to Chief in the amount of $80,000 *57 and to petitioner in the amount of $20,000. The $80,000 credit to GL Account 211 was disregarded so that, according to respondent's determination, petitioner's withdrawals from Chief increased between 1979 and 1980 by $47,881.50 instead of decreasing by $32,118.50 as shown in GL Account 211. Under this theory, the remaining $20,000 of the Johnson loan was treated as a withdrawal by petitioner in 1981, when Chief repaid the loan. In his amended answer, respondent alleged, as an alternative to the position taken in the notice of deficiency, that all of the $100,000 Johnson loan of January 28, 1980, was made to petitioner personally. Under this alternative theory, the $80,000 January 1980 credit to GL Account 211 would be recognized and the entire $100,000 would be treated as a withdrawal by petitioner in 1981 when Chief repaid the loan. Petitioner has not contested the correctness of respondent's computations of the amounts determined in the notice of deficiency or the amounts alleged in the amendment to answer. OPINION The issue to be decided is whether petitioner's withdrawals from Chief during 1979, 1980, and 1981 were bona fide loans or distributions taxable under sections *58 301 and 316. [3]Under these sections, any distribution of property made by a corporation with respect to its stock is to be taken into account in computing taxable income. Such distributions are to be treated as dividends or returns of capital depending on the amount of the corporation's earnings and profits. On the other hand, bona fide loans made by a corporation to its shareholders are not taxable. *59 Whether a shareholder's withdrawals from a corporation are distributions or loans depends on whether the shareholder intends to repay and the corporation intends to enforce repayment of the withdrawals at the time they are made. Chism's Estate v. Commissioner,322 F.2d 956, 959 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Haber v. Commissioner,52 T.C. 255, 266 (1969), affd. per curiam 422 F.2d 198 (5th Cir. 1970). Distinguishing spurious debts from bona fide indebtedness requires consideration of more than mere declarations of intentions and more than the absence or presence of corporate papers with the proper nomenclature. Alterman Foods, Inc. v. United States,505 F.2d 873, 876 (5th Cir. 1974). Rather, all the facts and circumstances surrounding the withdrawals of funds must be weighed and considered. Roschuni v. Commissioner,29 T.C. 1193, 1202 (1958), affd. per curiam 271 F.2d 267 (5th Cir. 1959). Among the objective factors that have been considered by the courts in *60 evaluating whether withdrawals by a shareholder are corporate distributions or loans are: the extent to which the shareholder controls the corporation; the magnitude of the withdrawals; whether a ceiling existed to limit the amount of permissible withdrawals; whether or not security was given; whether there was a set maturity date; whether the corporation ever undertook to enforce repayment; the earnings and dividend history of the corporation; whether the shareholder had a plan and means for repayment of the withdrawals; and whether there was any indication that the shareholder attempted to repay the withdrawals. Alterman Foods, Inc. v. United States,505 F.2d at 877 n. 7, and cases cited therein; Piggy Bank Stations, Inc. v. Commissioner,755 F.2d 450, 454 (5th Cir. 1985), affg. a Memorandum Opinion of this Court. This list of factors is not an exclusive one and no one factor or combination of factors is controlling. The evidence is abundantly clear that petitioner controlled Chief and its activities. There is no suggestion that his former wife attempted to exercise any control over the corporation during the first 10 months of 1979 when she *61 held a community one-half interest in the stock. Although Rasmussen, who became owner of 25 percent of the stock in January 1980, argued and complained about petitioner's management of Chief's affairs, petitioner nonetheless made the decisions as to the timing, amount, and use of the funds he withdrew. Thus, in withdrawing funds from the corporation, petitioner controlled the transactions on behalf of the corporation as well as himself, and "such situation invites special scrutiny." Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1339 (1971), affd. without opinion 496 F.2d 876 (5th Cir. 1974); Roschuni v. Commissioner,29 T.C. at 1202. As Chief's president and controlling shareholder, petitioner placed no ceiling on the amount of his withdrawals, gave no security for their repayment, and set no maturity date on the alleged loans. Chief had never formally declared or paid a dividend and took no steps to enforce repayment of the alleged loans. In years subsequent to the ones here in controversy, petitioner continued to withdraw large sums through GL Account 211 but gave neither notes nor security for repayment of the withdrawals. *62 Most of these factors support respondent's determination. Electric & Neon, Inc. v. Commissioner,56 T.C. at 1328-1329. Nonetheless, other factors support petitioner's contentions as to 1979 and 1980, and the issue is not to be resolved by counting and comparing the number of factors pro and con. Rather the task is to ascertain petitioner's bona fide intention with respect to the repayment of the withdrawals and Chief's intention with respect to the enforcement of repayment. Because petitioner handled the withdrawals on behalf of himself as well as the corporation, it is important to examine the precise objective facts peculiar to the transactions involved in this case. Based on such examination, we conclude that petitioner's withdrawals for 1979 and 1980 were loans. The withdrawals in 1981, however, were distributions by Chief and are to be so treated for the purposes of this case. From the beginning of Chief's existence until sometime in 1981, all withdrawals made by petitioner were meticulously recorded in GL Account 211, which was set up on the advice of Shaw, an outside accountant, and conscientiously maintained by Southern, Chief's bookkeeper, with petitioner's *63 full cooperation. The withdrawals were recorded and treated as loans on both petitioner's books and financial statements. Pierce v. Commissioner,61 T.C. 424, 431 (1974). For each year prior to 1979, petitioner executed a note reflecting the increase in the balance of GL Account 211. The account's balance fluctuated from year to year, [4] and the withdrawals during that period were regarded by all concurned as loans. During 1979, the balance of petitioner's GL Account 211 increased by $28,486.70, from $86,423.09 on December 31, 1978 to $114,909.79 on December 31, 1979. In that year, petitioner and his wife were divorced and he evidently had a number of unusual personal expenditures. The ledger entries indicate that many of the expenditures charged to the account were related to his divorce, and in 1980 and 1981 the expenditures include the renovation of two residences. Petitioner did not execute a note covering the 1979 increase in *64 keeping with his past practice. [5] Instead, petitioner told Shaw that he would raise the money from outside sources to cover the withdrawals. In January 1980 petitioner borrowed $100,000 from Johnson and applied the proceeds of the loan to GL Account 211, $80,000 in January and $20,000 in April 1980. As a result of those payments, the balance of the account as of December 31, 1980, was decreased by a net amount of $32,118.50, a sum in excess of the increase for 1979. We think the application of these funds to the account as well as petitioner's sensitivity to Shaw's advice on the handling of the account is evidence that petitioner at that point regarded the account as bona fide indebtedness. Resondent's principal argument is that the $100,000 Johnson loan was, in fact, made to Chief and not to petitioner and that, therefore, the application of the proceeds of the loan on GL Account 211 cannot properly be treated as a repayment. We do not agree. The issue is close but we think a preponderance of the evidence supports our finding. *65 Johnson described the $100,000 transaction as "a loan to Mike Wasnick" and testified that he was "lending it to Mike Wasnick, my understanding at that time." The note was signed by petitioner in his individual capacity as well as on behalf of Chief whereas petitioner as an individual signed none of the several other notes covering loans from Johnson to Chief. The check covering the proceeds of the loan was payable to petitioner whereas the checks for other Johnson loans were made payable to Chief. Petitioner personally provided Johnson with security for the note by naming Johnson as the beneficiary of a $100,000 insurance policy on the life of petitioner. Interest in the net amounts of $11,250 in 1980 and $12,654 in 1981 was paid on the note and charged to GL Account 211. The note was not treated as a liability of Chief on its books. These objective facts confirm petitioner's representation to Shaw that he would borrow the money from outside sources to cover the 1979 increase in GL Account 211 and his testimony that this $100,000 was borrowed for that purpose. This brings us to 1981, and we think respondent's position that the 1981 withdrawals were corporate distributions *66 must be sustained. Shaw had terminated his relationship with Chief and petitioner no longer had his guidance and counsel on Chief's financial affairs. GL Account 211 shows that its balance increased more than $125,000 in calendar year 1981, from $82,791.29 as of December 31, 1980 to $208,265.39 as of December 31, 1981. The recorded withdrawals include some $54,000 (consisting of two withdrawals of $44,302.67 and $10,000) in March 1981 and over $30,000 in October 1981, a total in excess of $84,000, for remodeling petitioner's residence. These large recorded 1981 withdrawals indicate that petitioner was using Chief's assets without regard to his ability or capacity to repay. More significant, petitioner used large amounts of Chief's assets for his personal purposes without having them recorded in GL Account 211 until Southern closed the books for Chief's Fiscal 1982. At petitioner's direction, Chief paid petitioner's $100,000 note to Johnson on July 8, 1981, when it sold its Lake Easter Addition property. See, e.g., Commissioner v. Makransky,321 F.2d 598, 601-602 (3d Cir. 1963), affg. 36 T.C. 446 (1961). Contrary to past practice, neither petitioner *67 nor Chief's then accountant instructed Southern to charge this amount to GL Account 211. She entered the Johnson loan repayment in a suspense account where it remained until Chief's books for fiscal year 1982 were closed. In addition, petitioner withdrew $154,522 from Chief's Washington Mutual Savings Bank account on September 18, 1981, to cover his commodity trading losses. Petitioner did not tell Southern or anyone else at Chief of the savings account withdrawal. As a result, the amount in the savings account was erroneously reflected as an asset in Chief's financial statements for September 30, 1981, and December 31, 1981. After all 1981 charges were made, the balance of the account stood at $497,283.07 as of Chief's 1982 fiscal year's end. By March 31, 1984, the balance had risen to $779,799 and no steps had been taken to document the withdrawals as loans. There was no practical probability that these huge sums would ever be repaid, and we think petitioner knew that during all of 1981. Petitioner makes the point that Chief did not have enough earnings and profits to cover the withdrawals and that, therefore, he was not using GL Account 211 to disguise dividends, citing *68 Pierce v. Commissioner,61 T.C. 424, 431 (1974). True, the withdrawals, according to the notice of deficiency, exceeded Chief's accumulated and current earnings and profits even though Chief had never paid a dividend. In given situations it is also true that attempts are made to disguise dividends as loans. But we do not think the point carries much weight here. Whether petitioner was attempting to disguise dividend distributions is not the test. Under section 301(a) and (c), any distribution of property by a corporation with respect to its stock is a dividend, an amount to be applied against basis, or an amount to be treated as gain from the sale or exchange of property. Absent any convincing evidence of a bona fide intention to repay the large balance as of December 31, 1981, we can only conclude that the 1981 withdrawals were distributions with respect to petitioner's stock. [6]
*69 The parties debate whether petitioner had sufficient personal assets with which to repay the withdrawals and whether he had adopted a plan of repaying them. The record does not contain a financial statement showing petitioner's assets and liabilities on any date during the relevant period. His income tax return for 1981 shows a salary of $57,800 from Chief and interest and dividend income totaling less than $1,000. The 1981 return also shows a loss of $158,323 from commodity trading. His 1982 return shows his commodity trading losses to have been $215,870. Absent some dramatic change, there was no prospect that the GL Account 211 balance would be paid from petitioner's income; if it was to be paid, repayment would have to come from some other source. Petitioner argues that he made substantial repayments of the GL Account 211 balances during the years in issue, that he adopted a repayment plan, and that he and Chief had assets which could be used to cover the withdrawals. Petitioner argues that, during this 3-year period, he paid over $54,000 to Chief in salary bonuses that were awarded to him. He argues that these substantial repayments constitute an actual manifestation of *70 the requisite intent to repay the withdrawals citing among other cases White v. Commissioner,17 T.C. 1562, 1569 (1952). [7] We do not find this argument convincing. It is true that GL Account 211 was credited with the following bonuses from Chief: Amount
Date
$16,634
3/31/79
$ 6,000
12/31/79
$12,000
3/31/80
$12,000
6/30/80
$19,500
12/31/81
Some courts have recognized that the application of bonuses and salaries to a taxpayer's withdrawal account *71 may constitute repayments of his withdrawals because the bonuses or salaries are taxable income. See, e.g., Shaken v. Commissioner,21 T.C. 785, 793 (1954); Johnson v. Commissioner,T.C. Memo. 1979-7, affd. 652 F.2d 615 (6th Cir. 1981). In the instant case, however, a $12,000 bonus credited in March 1980 was followed by a $12,000 charge in April 1980 and was described by Southern as an offsetting journal entry. Similarly $19,500 was credited on December 31, 1981, but the credit was followed by a cash withdrawal of $30,000 in January 1982. In terms of repaying the withdrawals, these bonus "payments" thus accomplished nothing. As to petitioner's alleged repayment plan, it is true that Shaw and Koenes testified that they recommended that petitioner arrange for Chief to increase his salary and bonus and apply such increases on GL Account 211. However, there was no practical way that the 1981 withdrawals could be repaid in this manner. Petitioner's salary and bonus for 1981, according to his tax return, was $57,800. Obviously, compensation at that rate would not provide enough money to repay the $497,000 balance of GL Account 211 *72 as of March 31, 1982. In the meantime, Chief's income dropped from $126,924 in fiscal year 1979 to $6,959 in fiscal year 1981, and Chief incurred losses in a total amount of over $113,000 in fiscal years 1983 and 1984. With such operating results, there were obvious limitations on the amounts of salaries and bonuses that would constitute reasonable compensation under section 162(a). We do not think increasing petitioner's salary and bonus was a practical or meaningful plan for repaying the huge balance of his account. There is a great deal of testimony in the record relating to petitioner's 50-percent individual interest as a partner in four large housing projects. The argument is that, when the Government restrictions on the use of those properties expire between 1987 and 1990, the properties will be very valuable. Had petitioner liquidated his interest in those properties in 1981, according to petitioner, he would have had enough money to repay the GL Account 211 withdrawals. We do not find this evidence convincing. We are not satisfied that petitioner's equity in those properties was substantial during 1981 and there is no evidence that petitioner had committed himself in *73 any way, by way of a mortgage or otherwise, to applying his share of any proceeds of those properties toward the repayment of his withdrawals from Chief. A general or contingent intent to repay the withdrawals in case he realized a windfall is not sufficient to show that the withdrawals created bona fide debts. [8]
We conclude that petitioner's withdrawals from Chief *74 in 1979 and 1980 were loans, but his withdrawals in 1981 were not bona fide loans. They were distributions with respect to his stock within the meaning of sections 301(a) and (c) and 316. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Petitioner has agreed that he is taxable on withdrawals of $11,084 in 1979 and $613 in 1980 from Chief Construction Company, Inc., and unreported wages in the amount of $7,243 for 1979. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
3. SEC. 301. DISTRIBUTIONS OF PROPERTY. (a) In General.--Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c). * * * (c) Amount Taxable.--In the case of a distribution to which subsection (a) applies-- (1) Amount constituting dividend.--That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income. (2) Amount applied against basis.--That portion of the distribution which is not a dividend shall be applied against and reduce the adjusted basis of the stock. (3) Amount in excess of basis.-- (A) In general.--Except as provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock, shall be treated as gain from the sale or exchange of property. SEC. 316. DIVIDEND DEFINED. (a) General Rule.--For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders-- (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxably year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301↩ applies, such distribution shall be treated as a distribution of property for purposes of this subsection.
4. During the periods from Mar. 31, 1967 through Mar. 31, 1977, petitioner owed Chief amounts ranging from approximately $9,000 to $18,000. As of Mar. 31, 1977, GL Account 211 reflected a debit (negative) balance of $30,307.↩
5. Petitioner did execute notes for each year in controversy after the Internal Revenue Service audit was begun but we give no weight to those notes.↩
6. Petitioner points out that Rasmussen owned 25 percent of Chief's stock during 1981 and that the withdrawals, if treated as distributions, were not proportionate among the shareholders. But petitioner had absolute control over the withdrawal of Chief's funds and sec. 301(a) and (c) is not limited to pro rata distributions. Barbourville Brick Co. v. Commissioner,37 T.C. 7, 13↩ (1961).
7. The facts in White v. Commissioner,17 T.C. 1562↩ (1952), are clearly distinguishable from the facts here before the Court. In that case, the taxpayer was a 40-percent shareholder, made withdrawals, but applied his salary, bonus, and travel expense allowances to his account. Subsequent to the year before the Court, the corporation acquired the taxpayer's stock as a pledge, brought suit against him for his withdrawals, obtained a judgment against him, and sold his stock. Here, in contrast, petitioner was, for all practical purposes, Chief's sole shareholder and the balance of his account more than tripled in the 2 years following 1981, the last year before the Court.
8. Rasmussen was called by petitioner and testified as follows: Q. Now I'll ask you this question. If Mr. Wasnick were to become successful in commodity trading or in any other business and were to make a lot of money, what do you think he would do with it as far as paying off his creditors? A. I believe if Mr. Wasnick was to make that kind of money that he would pay all of his debts off, both to the corporation and individuals he may owe money to. Such a general intent contingent on a windfall is not sufficient to show that the GL Account 211 withdrawals were true indebtedness. See Rapoport v. Commissioner,T.C. Memo. 1983-657, affd. without opinion 738 F.2d 419↩ (2d Cir. 1984).