GERALD PATRICK DIETRICK AND ANITA LEA DIETRICK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dietrick v. Commissioner
Docket Nos. 13616-84 and 42129-84.
United States Tax Court
T.C. Memo 1988-180; 1988 Tax Ct. Memo LEXIS 211; 55 T.C.M. (CCH) 706; T.C.M. (RIA) 88180; April 28, 1988. Stephen A. Kappers, for the petitioners. [1]
Genevieve K. Murtaugh, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income tax for the calendar years 1980 and 1982 as follows: Docket No.
Year
Deficiency
13616-84
1980
$ 70,864.55
42129-84
1982
38,490.19
After a concession by petitioners, the issues for decision are: (1) Whether the taxpayer, *212 who incurs and pays expenses for his closely held corporation from which his sole proprietorship possibly may later derive income, is protecting or promoting his sole proprietorship and so may deduct the corporation's expenses on his Schedule C. (2) If the taxpayer is found to be protecting or promoting his sole proprietorship, whether he may deduct the corporation's expenses when the corporation has transferred funds to him. This depends upon whether the corporation's transfers of funds to him are loans or reimbursements for the corporate expenses he has paid. (3) Whether the taxpayer may deduct under section 162 [2] a certain percentage of the wages paid to an employee of a corporation if the employee did work for the taxpayer's sole proprietorship as an agent of the corporation. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and the exhibits *213 attached thereto are incorporated herein by this reference. Petitioners Gerald Patrick Dietrick and Anita Lea Dietrick resided in Florence, Kentucky at the time of the filing of their petitions. Petitioners filed their joint Federal income tax returns (Forms 1040) for the taxable years 1980, 1981, and 1982, and an amended individual income tax return (Form 1040X) for the taxable year 1982 with the Internal Revenue Service Center in Memphis, Tennessee. Petitioner Anita Lea Dietrick is a party in this case solely because she filed joint income tax returns with her husband for each of the years in issue. All further references to "petitioner" are to Gerald Patrick Dietrick. In approximately 1959 petitioner began operating a sole proprietorship known as Dietrick Sales and Service. This business provided a wide variety of engineering services, which primarily included the sales and service of filtration equipment, water waste treatment, tramp oil systems and oil water separators, generally referred to as the filtration operation. Petitioner became interested in the Windecker Eagle airplane (hereinafter referred to as the Eagle) in 1973 when he bought an Eagle from Windecker *214 Industries, Inc. The Eagle is a single engine, high performance aircraft constructed of a composite material known as NUF, or nonwoven, unidirectional fiberglass material. The Eagle was first conceived by Dr. Leo J. Windecker, a dentist who devoted substantial time to aircraft research and development. Dr. Windecker incorporated Windecker Industries, Inc. in 1967 primarily for the purpose of developing, manufacturing, and marketing the Eagle. Petitioner had no experience in the aircraft industry other than as a private pilot. Petitioner became convinced that the Eagle could be commercially successful and proceeded to acquire certain indebtedness of the financially troubled Windecker Industries, Inc. The indebtedness petitioner acquired was secured by various assets of Windecker Industries, Inc. that were required to manufacture the Eagle. Windecker Industries, Inc. had obtained a Federal Aviation Administration (FAA) Type Certificate on the Eagle and had manufactured seven of the aircraft before it defaulted on its indebtedness. Petitioner then foreclosed on his security interests and obtained machine tools, production molds, the FAA Type Certificate on the Eagle, aircraft *215 tooling, the machine that manufactured NUF, trademarks and registered trade names, and engineering specifications. Petitioner then purchased substantial aircraft inventory that Windecker Industries, Inc. had on hand. Petitioner sold most of the machine tools, but retained the FAA Type Certificate and aircraft tooling, unique machine tools and production molds, as well as the machine that manufactured NUF. Petitioner initially attempted to market the Eagle on his own through his sole proprietorship, Dietrick Sales and Service. Petitioner later decided to set up a corporation for the manufacture and sale of the Eagle. Petitioner decided to incorporate for several reasons, including his belief that his Schedule C operation had become too complex and his desire to separate his various enterprises. Other reasons were his belief that the best way to finance the production of the Eagle was through contributing shareholders and his desire for an entity that would continue even if something were to happen to him. Thus, petitioner hired an engineer to take over the Dietrick Sales and Service filtration operation so petitioner could incorporate a company, Composite Aircraft Corporation, *216 to produce the Eagle aircraft and devote his full time to the aircraft business. On April 1, 1979, Composite Aircraft Corporation (hereinafter referred to as Composite) was organized under the laws of the State of Delaware. Composite filed a corporation income tax return (Form 1120) for the taxable years 1980, 1981, and 1982, with the Memphis Service Center. In addition, Composite filed Employer's Quarterly Federal Tax Returns (Forms 941) for the four quarters of the calendar year 1980 with the Memphis Service Center. At the time Composite was organized petitioner transferred to Composite all of the assets required for the production of the Eagle, except the NUF machine, that he had acquired from Windecker Industries, Inc., as well as know-how and engineering data in exchange for 310 shares of common stock in Composite. Under the FAA Type Certificate, Composite had the right to use the name "Windecker" in connection with the Eagle. Petitioner retained ownership of the NUF machine. The NUF machine was kept at the Dietrick Sales and Service plant in Midland, Texas. However, petitioner entered into a contract with Composite to supply Composite with its requirements of NUF "at *217 his cost." [3]
In addition to the assets transferred to Composite by petitioner, Composite sold a few shares of stock through three private offerings on April 1, 1979, March 1, 1980, and January 20, 1981, to obtain financing for the Eagle project. Each of the three offering circulars warned potential investors that "If Windecker Industries, which was larger and better capitalized than [Composite], was unable to manufacture and market the Eagle on a commercially successful basis, there can be no assurance that [Composite] will be able to manufacture and market the Eagle successfully." Petitioner was the controlling shareholder of Composite, owning over 90 percent of the issued and outstanding stock at all times. Moreover, the purchasers of the stock were required to execute a Voting Trust Agreement authorizing petitioner to act as voting trustee and to vote all of their shares subject to the voting trust. These three offerings resulted in capital *218 contributions to Composite from shareholders of $ 75,000 (12 shares x $ 6,250 per share) as of September of 1979, $ 85,800 (11 shares x $ 7,800 per share) as of June of 1980, and $ 9,750 (one share x $ 9,750 per share) as of February of 1981, for a total capital contribution of $ 170,550. These contributions fell far short of the $ 1.25 million that Composite had set as its original goal. Composite placed these funds in interest-bearing accounts and Treasury bills so the funds could earn interest. Petitioner used his own funds to pay the corporation's expenses, using Account 22 of Dietrick Sales and Service for that purpose. Petitioner believed that the only way the Eagle could become commercially feasible was if the wing of the Eagle that Windecker Industries, Inc., had originally manufactured was redesigned. In September of 1979, Composite hired a full-time aeronautical engineer and hired the original designer, Dr. Leo J. Windecker, as a consultant. Composite hired George Alther (hereinafter referred to as Alther) as its aeronautical engineer. Alther had once been the chief engineer on the Eagle's original design team at Windecker Industries, Inc. Due to the risky nature *219 of the new enterprise, petitioner and Alther orally agreed to a contingency plan under which Alther could switch to the filtration operation at the Dietrick Sales and Service plant in Midland, Texas, if Composite could not attract sufficient financing for the Eagle project. Since petitioner and Alther wanted to promote the Composite name, in early 1980 they decided to operate only under the Composite name in Midland, Texas and to close out any reference to Dietrick Sales and Service in Midland. By 1981 all references made to the Midland, Texas plant referred to Composite only. In 1980, petitioner paid Alther to perform services for Dietrick Sales and Service. [4] Petitioner drew twelve checks on his Dietrick Sales and Service account to Alther, each of which was for $ 2,864.35 with the notation "payroll," for a total of $ 34,372.20. Petitioner deducted these payments on his Schedule C as part of his cost of goods sold. In addition, petitioner drew a check on the Dietrick Sales and Service account in the amount of $ 1,650 with the notation "Fed. Tax Deposit for Composite Aircraft" for withholding taxes relative to Alther's salary. See n.4, supra. Petitioner also deducted *220 this expenditure on his Schedule C as part of his cost of goods sold. Petitioner also recorded Alther's salary payments in Account 22, which was the account petitioner used to record the amounts he spent to pay Composite's expenses. The total amount of expenditures that petitioner included in Account 22 for 1980 was $ 137,638.31. Since Composite was still unable to begin production of the Windecker Eagle due to the lack of financial capital, in 1981 Alther was assigned to *221 do consulting work in the oil industry in which he had had experience before he became an employee of Composite. Although Alther was an employee of Composite, he did consulting work using the name "Alther Engineering" because his name was well known in the oil industry while Composite's name was not. During the years in issue here, all of Alther's W-2 forms were issued by Composite. The record does not disclose whether Composite had a separate bank account in 1980, but by 1981 it apparently did have one. Some of the consulting fees that Alther generated as Alther Engineering were deposited in the Composite corporate bank account and used to help pay Alther's salary and expenses for the year. During 1981, petitioner also wrote eight checks on the Dietrick Sales and Service account payable to George Alther totaling $ 20,050.45, which he classified as "wages," included in Account 22, and deducted on his Schedule C as cost of goods sold. [5]
In early 1982, petitioner incorporated the filtration operations of Dietrick Sales and Service, and also *222 incorporated Tailwinds Aviation, Inc., an aircraft service organization. The record does not disclose which of petitioner's various assets were transferred to each of these corporations. In particular, the record does not establish whether the NUF machine was transferred to the new Dietrick Sales and Service Corporation or Tailwinds Aviation or was retained by petitioner individually. There had been some sales of NUF in 1979, but there were no sales of such material during any of the years before the Court. The NUF machine had never been used to produce any NUF material for Composite up to the time of the trial. Neither petitioner nor Composite had ever produced an Eagle plane up to the time of the trial. As president, director, and principal shareholder of Composite, petitioner spent a great deal of the time attempting to obtain financing for the airplane project through publicity for the plane. In this effort petitioner agreed to let Composite use his Eagle for demonstration and promotional purposes. Publicity for Composite included exhibiting the Eagle at air shows, taking part in races, and publishing the "Tail Feather," a newsletter about the Eagle. Each of Composite's *223 Confidential Offering Circulars specified that since Composite did not have a full-time sales force, it would rely on petitioner's efforts to obtain orders for the Eagle at air shows and through personal contact with prospective customers. In 1982 petitioner negotiated a lease with the United States Army in which the Army would pay Composite $ 15,000 per month to lease petitioner's Eagle and Composite would then pay petitioner for the use of the airplane. [6] Petitioner agreed to devote substantially all of his time to Composite's affairs and work initially without compensation. In its Confidential Offering Circulars, Composite included expenditures for air show travel expenses when specifying how the proceeds would be disbursed. The Circulars specifically stated that petitioner *224 would make his Eagle available to Composite for demonstration and promotional purposes and would be reimbursed for his expenses in connection therewith. The Confidential Offering Circulars also specified that petitioner had previously advanced funds to cover Composite's expenses and that petitioner would be reimbursed from the proceeds of the offering. The initial circular expressly stated that petitioner could also elect in the future to advance funds on behalf of Composite to cover expenses, and Composite would reimburse petitioner for such advances from the proceeds of the offering available at that time. In 1980 Composite transferred a total of $ 91,000 to petitioner. Petitioner executed no notes in favor of the corporation, no interest was specified, and no unconditional promise to repay existed. In addition, in late December of 1980 Composite obtained a loan from a financial institution in the amount of $ 65,000 that was secured by Treasury bills Composite owned, which were not due until March and June of 1982. Composite then transferred the $ 65,000 to petitioner. In the 1981 Offering Circular, the above transfers, plus another bringing the total to $ 160,800, were characterized *225 as loans from Composite to petitioner. Petitioner was not sure how he would ultimately treat the $ 65,000 transfer from Composite to himself. If Composite were to be liquidated or sold, petitioner wanted the loan amount taken out of the proceeds and petitioner would then report the loan as income to himself. If Composite proved successful, petitioner wanted to repay the loan to Composite or use it as the basis for the cost of additional shares in Composite. As with the previous transfer of $ 91,000 from Composite to petitioner, no note existed between Composite and petitioner as to the $ 65,000, no interest was charged, and no unconditional promise to repay existed. That was the situation as to the entire $ 160,800 "loan" referred to in the 1981 circular. [7]
On his 1980 Schedule C. petitioner deducted as part of his cost of goods sold or as expense the $ 137,638.31 he recorded in Account 22 as expenses he paid for Composite. [8] On March 15, 1984, respondent issued a statutory notice of deficiency *226 to petitioner for the 1980 tax year. Respondent disallowed most of the Account 22 expenditures that petitioner had claimed as deductions on his Schedule C as cost of goods sold and as expenses. [9] Except possibly the wages paid to Alther, discussed above, the disallowed Account 22 expenditures represented corporate expenses of Composite Aircraft Corporation that petitioner had paid. In addition, respondent disallowed a medical deduction of $ 2,018.77 due to the increase in the amount of petitioner's adjusted gross income because of the disallowed deductions. [9]
*227 On October 31, 1984, respondent issued a statutory notice of deficiency to petitioner for the 1982 tax year. In this notice of deficiency respondent disallowed a net operating loss carryover of $ 84,392.97 from petitioner's 1981 tax year that petitioner had used on his 1982 individual income tax return. This net operating loss carryover was the result of petitioner's claiming deductions in 1981 on his Schedule C as cost of goods sold and as expenses of amounts recorded on Account 22. [10] Except possibly the wages paid to Alther, discussed above, these Account 22 expenditures represented corporate expenses of Composite Aircraft Corporation that petitioner had paid. Respondent also disallowed expenditures totaling $ 4,082.37 for the 1982 year, which were recorded on Account 22 for Composite's expenses for that year, that petitioner claimed as deductions on his Schedule C as part of his coost of goods sold. *228 OPINION §ection 162(a) allows a taxpayer to deduct all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." [11] Under section 162 the payment by one taxpayer of an expense of another taxpayer's trade or business is not deductible. Deputy v. du Pont,308 U.S. 488, 494 (1940); Welch v. Helvering,290 U.S. 111, 115 (1933). As a general rule, the trade or business of a corporation is not also a trade or business of its shareholders. Whipple v. Commissioner,373 U.S. 193, 202 (1963). Shareholders do not engage in a trade or business when they invest in the stock of a corporation. 373 U.S. at 202. Thus, a shareholder is generally not permitted to deduct from his personal income his payment of the corporaton's expenses. Deputy v. du Pont, supra;Betson v. Commissioner,802 F.2d 365, 368 (9th Cir. 1986), affg. on this issue a Memorandum Opinion of this Court; Rink v. Commissioner,51 T.C. 746, 751 (1969). The expenditures, if not loans, are considered capital contributions under 263. Betson v. Commissioner, supra,802 F.2d at 368. *229 Sums advanced with the intent of yielding income from business operations in future years are generally considered capital contributions. Betson v. Commissioner, supra,802 F.2d at 371. An exception to this general rule exists if the taxpayer pays the expenses of another to protect or promote his own trade or business. Gould v. Commissioner,64 T.C. 132, 134-135 (1975); *230 Lohrke v. Commissioner,48 T.C. 679, 684-685 (1967); Pepper v. Commissioner,36 T.C. 886, 895 (1961). In that instance the taxpayer may take the deduction, even though the transaction that gives rise to the payments originated with another person and would have been deductible by that other person if that other person had made the payment. Gould v. Commissioner, supra,64 T.C. at 134-135; Lohrke v. Commissioner, supra,48 T.C. at 684-685; Pepper v. Commissioner, supra,36 T.C. at 895; Dinardo v. Commissioner,22 T.C. 430, 436 (1954); L. Heller & Son, Inc. v. Commissioner,12 T.C. 1109, 1112 (1949). The first issue for decision is whether petitioner paid his corporation's expenses in order to protect or promote his sole proprietorship and so may deduct his payments of the expenses of another taxpayer, Composite. Respondent argues that petitioner is not entitled to deduct Composite's expenses because petitioner may not deduct the expenses of another taxpayer and does not come within any exception to that general rule. On the other hand, petitioner contends that his *231 payment of Composite's expenses is fully deductible since petitioner paid these expenses to protect or promote his sole proprietorship. [12]
*232 Under the exception the taxpayer must make the payments to retain or protect the taxpayer's existing, ongoing business rather than to acquire, invest in, or establish a new business. Pepper v. Commissioner, supra,36 T.C. at 895; Snow v. Commissioner,31 T.C. 585, 591 (1958). [13] In Dodd v. Commissioner,298 F.2d 570 (4th Cir. 1962), affg. a Memorandum Opinion of this Court, the taxpayer operated his sole proprietorship and a corporation from the same address with the same employees and many of the same customers. Due to the fact that the corporation was undercapitalized, the taxpayer advanced funds to the corporation to meet current operating expenses. The corporation reimbursed the taxpayer for some of the funds the taxpayer advanced for the corporation's benefit. The taxpayer, however, deducted the unreimbursed amounts and stated that the payments were made to protect and preserve the credit and goodwill of his sole proprietorship. The Fourth Circuit stated that the taxpayer's position reduced itself "to the contention that his own individual business and that of the corporation were so intertwined as to be virtually one, and *233 the expenses of the corporation (to the extent of the advances not repaid) presumably deductible by the corporation itself, were also deductible expenses of the taxpayer's separate business." 298 F.2d at 573. The Fourth Circuit disagreed. The Fourth Circuit disallowed the deductions, finding that the taxpayer's purpose in making the advances was to establish a new business and pay the current expenses of the corporation in order to keep it in existence. 298 F.2d at 578. The court found that any benefits to the credit rating or goodwill of the taxpayer's sole proprietorship were incidental, and that the taxpayer's payments of the corporate expenses were just contributions to capital. 298 F.2d at 578. In addition to the fact that the payment must be made to retain or protect the taxpayer's existing business, the other entity that incurred the expense must previously have provided the taxpayer's trade or business with income *234 or other benefits. In Dinardo v. Commissioner,22 T.C. 430 (1954), we held that the taxpayer's medical partnership could deduct payments it made to cover the operating deficits of a nonprofit corporation that the taxpayer had previously organized to operate a private hospital. The taxpayer had initially organized the hospital to protect and augment the taxpayer's medical practice. The Court found that the taxpayer made the payments in question to keep the hospital in operation so that the taxpayer could continue to earn medical fees from patients who would come or be sent to the taxpayer because of the taxpayer's access to the hospital. 22 T.C. at 435-436. The Court reasoned that the payments were not capital advances made to finance a new enterprise but payments so the taxpayer could continue to receive the additional medical fees from his medical practice. 22 T.C. at 438. In Lohrke v. Commissioner, supra,48 T.C. at 688, the above standards were refined and restated by this Court. The Court specified that two elements must be met before a taxpayer can deduct the ordinary and necessary business expenses of another *235 taxpayer under the protect-or-promote exception. In that case the taxpayer received a substantial amount of royalty income from the licensing of a patent on a process used in the synthetic fiber industry. The taxpayer also had a substantial interest in a corporation that used the patented process in the conversion of synthetic fibers into fabrics. When the corporation made a shipment of defective fiber to a customer, the taxpayer agreed to be held personally liable. The taxpayer agreed to this because the corporation could not afford to lose the sale of the fiber and the taxpayer did not want to lose the benefits that he, as a licensor and inventor of the patented process, derived from having access to the manufacturing facilities of the corporation. The taxpayer tried to deduct the payments he made for the resulting losses. This Court in Lohrke v. Commissioner, supra,48 T.C. at 688, established two elements or a two-prong test to determine whether a taxpayer could deduct the expenses of another person. The first element is whether the taxpayer's purpose or motive for paying the obligation of the other entity is to protect or promote the taxpayer's own trade *236 or business. 48 T.C. at 688. The second element is whether the expenditure is an ordinary and necessary expense of the taxpayer's own trade or business. 48 T.C. at 688. In Lohrke v. Commissioner we found that the taxpayer's primary motive for paying the obligation of the corporation was to protect his individual licensing business, which was receiving several benefits from the continued existence of the corporation. 48 T.C. at 689. These benefits included using the corporation as a pilot plant so prospective licensees could sample the fiber processed by the patented process and using the corporation to gain a sufficiently intimate knowledge of trade activities so the taxpayer would know whether companies were using the patented process without a license or paying inadequate royalties. As to the second element or prong of the test, in determining what is an ordinary and necessary business expense, necessary means appropriate and helpful. Welch v. Helvering,290 U.S. 111, 113 (1933). Ordinary does not mean that the payments must be habitual or normal to the taxpayer but, instead, denotes payments that are a common and *237 accepted means of protecting or promoting the taxpayer's own trade or business. Welch v. Helvering, supra,290 U.S. at 114. In Lohrke v. Commissioner, supra,48 T.C. at 689, we found that the taxpayer's payment was proximately related to his individual licensing business and so was ordinary and necessary. 48 T.C. at 689. Thus, the taxpayer was entitled to deduct the payment as an ordinary and necessary business expense of carrying on his licensing business. In this case petitioner attempts to defend his deductions for payments he made for Composite by claiming that he comes within the protect-or-promote exception to section 162. Petitioner claims that he was trying to protect or promote his sole proprietorship, Dietrick Sales and Service, when he paid the expenses of Composite. Under the general rule of Section 162, once petitioner incorporated Composite he was no longer entitled to deduct the payment of Composite's expenses on his individual income tax return. To determine whether the exception applies we will apply the two-prong test of Lohrke v. Commissioner, supra.Petitioner bears the burden of demonstrating *238 that he satisfies each prong of the test. Rule 142(a). Under the first element of the two-prong test in Lohrke v. Commissioner, supra,48 T.C. at 688, petitioner must demonstrate that his purpose or motive for making the payment was to protect or promote petitioner's sole proprietorship. Petitioner argues that he paid Composite's expenses to both financially benefit his sole proprietorship and protect the goodwill or reputation of his own business. Petitioner first argues that the expenses he paid were incurred to organize and obtain financing for Composite so that his sole proprietorship could later derive income by selling NUF to Composite to make the Eagle airplanes. Since petitioner owned the machine that produced the NUF material, petitioner contends that it was critical for him to insure Composite's success so he could earn money on his investment in the machine. We find that petitioner's primary motive for paying Composite's expenses was to establish a new business rather than protect or promote his sole proprietorship. Petitioner wants the best of both worlds in which he can take advantage of the benefits of incorporation while personally deducting the *239 expenses of the corporation. Under the protect-or-promote exception to section 162, petitioner's payments are not deductible since the payments were made so petitioner could establish a new business rather than protect or promote his sole proprietorship. The protect-or-promote exception only applies if the payments are made to retain or protect an existing business rather than establish a new business. Dodd v. Commissioner, supra,298 F.2d at 573. Petitioner initially attempted to market the Eagle on his own through his sole proprietorship. However, petitioner decided to set up a corporation for production of the Eagle for a number of good business reasons: his belief that the best way to finance production of the Eagle was through contributing shareholders; his wish to separate the Eagle aircraft project from his sole proprietorship, which dealt primarily with oil filtration; and his desire for continuity of the Eagle aircraft business in case anything happened to him. The expenses of Composite that petitioner paid included expenses incurred in organizing the new corporation and trying to obtain adequate financing so Composite could commence production of the *240 Eagle. In addition, petitioner, as the president, director, and principal shareholder, agreed to advance funds to Composite until such time as Composite could reimburse him from the proceeds of the private offerings or otherwise. The fact that petitioner (either through his sole proprietorship or perhaps through his other corporations -- Dietrick Sales and Service or Tailwinds Aviation) might benefit from Composite's possible future success is not sufficient to bring this case within the protect-or-promote exception. In addition, in Lohrke v. Commissioner, supra, and Dinardo v. Commissioner, supra, we held that the taxpayers could deduct the expenses of another legal entity because the taxpayer's own trade or business had previously received benefits from the corporations whose expenses they paid. The taxpayers in those cases paid the corporations' expenses only when the taxpayers thought that their own trade or businesses might lose those benefits. In this case neither petitioner's sole proprietorship nor his other two corporations had ever received any benefits from Composite. Petitioner never furnished any NUF material to Composite and had *241 he done so, it would have been furnished "at his cost" (see n.3, supra); petitioner never received any compensation for consulting services rendered to Composite. Hence, petitioner's argument that payment of Composite's expenses was to protect or promote "his business of supplying N.U.F. and consulting services to Composite" is merely theory without a factual basis. Petitioner also speculates that Dietrick Sales and Service (sole proprietorship or closely held corporation) runs the risk of being placed in "severe financial straits" unless Composite proves successful. Petitioner has offered no proof that Dietrick Sales and Service would be placed in any financial danger if petitioner had not paid Composite's expenses. In fact, Dietrick Sales and Service has been in business since 1959 and its principal business was the filtration operations, not the fledgling aircraft business Mr. Dietrick was trying to launch. Without any sale of NUF to Composite, Dietrick Sales and Service continued its profitable filtration business and was incorporated in 1982. In fact the record does not establish whether the NUF machine was transferred to the new Dietrick Sales and Service Corporation *242 in 1982, was transferred to Tailwinds Aviation, or remained as one of Mr. Dietrick's personal assets. Petitioner contends that by specifying both "protect" and "promote" in the exception to section 162 in Lohrke v. Commissioner, supra, this Court intended to include both the protection of prior benefits or income and the promotion of possible future income or benefits. Petitioner argues that his payment of composite's expenses falls within the exception since he intended to promote his sole proprietorship through Composite's use of NUF material in the future. We disagree with this analysis factually for the reasons stated above and also legally. This Court did not intend to include benefits that had never materialized prior to the taxpayer's payment of expenses under the protect-or-promote exception. It is too speculative to guess whether benefits that have not materialized by the time the taxpayer pays his corporation's expenses might have benefited the taxpayer's own separate trade or business. Thus, we find that petitioner's primary motive for paying Composite's expenses was not to financially benefit his sole proprietorship or his other corporations since *243 they had never received any financial benefits from Composite, either prior to the payment of these expenses or up to the time of trial. Petitioner also argues that his motive for paying Composite's expenses was to protect or promote his trade or business through the protection of his own business' goodwill or reputation, relying on Jenkins v. Commissioner,T.C. Memo. 1983-667. In that case this Court held that one means of protecting a taxpayer's trade or business was to protect that trade or business' reputation. [14] In Jenkins v. Commissioner the taxpayer, country music entertainer Conway Twitty, repaid the investors, who included the taxpayer's friends and business associates, the amounts they invested in Twitty Burger after he decided to shut down the financially troubled Twitty Burger corporation. We found that the taxpayer made those payments with the primary motive of protecting his personal business reputation in his ongoing business of being a country music entertainer. The Court found that the possibility of extensive adverse publicity concerning the taxpayer's involvement in the defunct corporation, which would reflect on the taxpayer's reputation *244 for integrity, was a very likely possibility. The Court based this determination on both the taxpayer's testimony that allegations of fraud against him, with several investors threatening to sue him, could ruin the positive image that he had carefully built over the years, and the expert testimony of the Director of Country Music Foundation who testified that a country music entertainer's character, personality, and credit reputation are part of his role as a country singer and have an effect on the popularity of that singer. Petitioner bears the burden of proving that the nonpayment of Composite's expenses would have adversely affected petitioner's business reputation. Rule 142(a). Petitioner has not established that he paid Composite's expenses to maintain his own or his other corporations' reputation or goodwill. Petitioner claims that he was an entrepreneur who relied on his reputation for good business acumen to attract investors to his business enterprises. Unlike the taxpayer in Jenkins v. Commissioner, supra, *245 petitioner offered no evidence to demonstrate that the failure of Composite to pay its expenses would reflect unfavorably on either the reputation of Dietrick Sales and Service or the reputation of petitioner himself as a businessman. Without such evidence petitioner has failed to meet his burden of proof. Moreover, we note that each of the private Offering Circulars expressly warned potential investors that Mr. Dietrick had no experience in the aircraft industry other than as a private pilot. Those circulars also warned potential investors that if Windecker Industries which was larger and better capitalized than [Composite] was unable to manufacture and market the Eagle on a commercially successful basis, there can be no assurance that [Composite] will be able to manufacture and market the Eagle successfully.
In other words, there is no evidence that anyone was relying upon the business reputation of Mr. Dietrick or of his sole proprietorship/corporation, Dietrick Sales and Service. Likewise, there is no evidence that the success or failure of Composite's Eagle aircraft business would have any impact on petitioner or his other business activities. Thus, petitioner *246 has failed to prove that his primary motive for paying Composite's expenses was to protect or promote petitioner, his sole proprietorship, or his other corporations, either financially or through their reputation. The second element of the two-prong test in Lohrke v. Commissioner, supra,48 T.C. at 688 is whether the payment was an ordinary and necessary expense of the taxpayer's own trade or business. Since both prongs of the test must be met and we have determined that petitioner has not met the first prong, we need not determine whether this second element has been met. However, the same facts discussed at length above establish that petitioner also could not meet this test. Petitioner's payment of Composite's expenses was not proximately related to his own separate trade or business. Even if the protect-or-promote exception were applicable to petitioner, and we have concluded it was not, petitioner still could not deduct the payment of expenses for which he was reimbursed by Composite. A taxpayer cannot deduct payments for expenses for which he has been reimbursed by the corporation. In Composite's Confidential Offering Circulars, Composite included air *247 show travel expenses as one of the purposes for which the proceeds would be disbursed. The circulars specifically stated that Mr. Dietrick would use his own Eagle airplane "for demonstration and promotional purposes and will be reimbursed for his expenses in connection therewith." In addition, Composite specified in its Confidential Offering Circulars that petitioner would be reimbursed for payments he made on behalf of Composite. Petitioner attempted to deduct on his own Schedule C payments of $ 137,638.31 for 1980, $ 87,959.27 for 1981, and $ 4,082.37 for 1982. However, Composite transferred a total of $ 156,000 to petitioner in 1980, and an additional amount in 1981 to bring the total up to $ 160,800, the total capital contributions received in the first two stock offerings. The parties in this case disagree as to the proper characterization of these transfers of funds. Petitioner says these transfers of funds were loans to him from Composite. Respondent says these transfers of funds were reimbursements to petitioner for the corporate expenses he had paid. The third Offering Circular in early 1981 characterized the $ 160,800 transfers as "loans" from Composite to petitioner. *248 Thus, petitioner argues the funds were not reimbursements of expenses he had paid. The primary test used to determine whether a distribution from a corporation is a dividend or a loan is the intent to repay or retain the amounts. Estate of Chism v. Commissioner,322 F.2d 946, 960 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Pierce v. Commissioner,61 T.C. 424, 430 (1974); Nasser v. United States,257 F. Supp. 443, 447 (N.D. Cal. 1966). This determination is a question of fact to be determined from all of the circumstances. Estate of Chism v. Commissioner, supra,322 F.2d at 960. The taxpayer bears the burden of proof. Welch v. Helvering,290 U.S. 111, 115 (1933). Although this case does not deal with the dividend versus loan issue, the same intent test applies to determine whether a transfer is a loan or a reimbursement for the shareholder's payment of the corporation's expenses. Frequently, the inquiry is whether an amount paid to a corporation by a shareholder is a loan or a contribution to capital. Here, with a corporation that is vastly undercapitalized for its business *249 of developing, manufacturing, and selling a new type of airplane, we have the anomalous situation of the corporation making a distribution of its limited funds to the principal shareholder, purportedly as "loans." An inquiry into the subjective intent of petitioner requires an examination of both his testimony and the objective evidence of intent. This objective evidence includes: (1) whether the transferor corporation was closely held, (2) whether notes were executed, (3) whether the purported obligation was secured by collateral, (4) whether there were fixed dates or a schedule for payment, (5) whether interest was paid or accrued, (6) whether there was a limit to the amount that could be advanced to a shareholder, (7) whether the corporation took steps to collect on overdue "loan," (8) whether any part of the advances were repaid, (9) how the transfers were treated on the books and records, the tax returns and financial statements of the corporation and shareholder, and (10) whether there was a specific business purpose for making the advances. Alterman Foods, Inc. v. United States,505 F.2d 873, 878-879 (5th Cir. 1974); Berthold v. Commissioner,404 F.2d 119, 121-122 (6th Cir. 1968), *250 affg. a Memorandum Opinion of this Court; Pierce v. Commissioner,61 T.C. 424, 430-431 (1974). In this case, although the transfers were labeled as "loans" in the third Offering Circular and although petitioner testified to that effect, we conclude on the basis of the record as a whole that petitioner has failed to establish that he had any obligation to repay, or intent to repay, these funds to Composite. Petitioner claims that the transfers were loans, pointing out that he repaid $ 25,000 of the $ 65,000 loan Composite had borrowed from a bank when Composite's note to the bank came due. Petitioner offered no objective evidence to prove that the transfers to him were loans. No note was ever executed by petitioner, no agreement existed between Composite and petitioner stating that the transfers were loans, no mention of collateral was made, no schedule existed for repayment, no interest was specified, and the loan transaction was not recorded as such on the corporate books or records. In fact, petitioner testified that he was uncertain as to how he would ultimately characterize the $ 65,000 transfer. In light of this, petitioner's testimony that the transfers *251 were loans and the characterization of the transfers as a loan in Composite's third Offering Circular do not satisfy petitioner's burden of proof. Thus, we conclude that the transfers were reimbursements to petitioner. We hold that even if the protect-or-promote exception applied to petitioner, he still could not deduct those expenses for which he received reimbursement from Composite. Lastly, petitioner claims that even if he cannot deduct the payments under the protect-or-promote exception, he properly deducted Alther's salary on Schedule C of his individual income tax return. Petitioner contends that he should be allowed to deduct 90 percent of Alther's salary since Alther spent at least 90 percent of his time working for the sole proprietorship, the filtration operations, in 1980 and 1981. Respondent argues that salaries of employees who are in the employ of a separate and distinct corporate entity are only deductible by that entity, citing Columbia Rope Co. v. Commissioner,42 T.C. 800, 815 (1964); and Young & Rubicam, Inc. v. United States,410 F.2d 1233, 1237 (Cl. Ct. 1969). Respondent says taxpayer has the burden of proving that a particular *252 individual was involved in a specific activity clearly for the proximate and direct benefit of the taxpayer rather than of that other entity. Young & Rubicam, Inc. v. United States, supra,410 F.2d at 1239. In this case, at the time Composite hired Alther as an aeronautical engineer, petitioner and Alther agreed to a contingency plan under which Alther would work for the filtration operation if Composite could not attract sufficient financing to commence production of the Eagle. Composite never received the amount of capital contributions that were necessary to begin production of the Eagle. Although Alther remained an employee of Composite throughout the years in issue and received his W-2's from that corporation, he spent most of his time working for the filtration business and his wages were actually paid by Mr. Dietrick in 1980 and 1981. [15]
*253 Petitioner argues that when Composite could not obtain adequate financing to begin production of the Eagle, Alther was reassigned, according to his agreement with petitioner, to do consulting work for Dietrick Sales and Service. Although Alther used the name "Alther Engineering," we find that he only did so because his name was better known than Composite's and not because he was no longer working for Composite. However, assuming Alther was Composite's employee and worked in the filtration business as an agent of Composite, that does not mean petitioner would not be entitled to deduct any amounts he actually paid for services actually rendered to his sole proprietorship. The parties seemed to argue this issue as if only Composite or only petitioner could deduct Alther's wage expense. This case is factually distinguishable from Columbia Rope Co. v. Commissioner, supra.This case does not involve a section 482 reallocation of expenses as in Young & Rubicam, Inc. v. United States, supra.However, even under that case, a taxpayer who can show that the employee worked part of the time for the proximate and direct benefit of the taxpayer may deduct *254 a percentage of the earnings for the time the employee devoted solely to the taxpayer. Young & Rubicam, Inc. v. United States, supra,410 F.2d at 1240-1241. The fact situation in the instant case is more like the "Kelly Girl" or leased employee case. Petitioner can deduct on his Schedule C any reasonable amounts he paid Composite for services actually rendered by Alther to the filtration operation; Composite should then report that income on its tax return and in turn deduct the amount it actually paid Alther as its corporate employee. That is not exactly what happened, but in essence that is the substance of the transaction. See nn.4,5,15, supra.
Accordingly, we hold that petitioner is entitled to deduct on his Schedule C 90 percent of the $ 36,022.20 he paid for Alther's wages and withholding tax in 1980, and 90 percent of the $ 20,050.45 that he paid for Alther's wages in 1981. However, those amounts must be reduced to the extent that petitioner was reimbursed for such expenditures by Composite. [16]
*255 Except for some portion of Alther's wages, petitioner cannot deduct any payments he made on behalf of Composite on his Schedule C since those expenses were those of another taxable entity and petitioner was not protecting or promoting his own trade or business in making the payments. To reflect the concession and the foregoing holdings, Decisions will be entered under Rule 155.
Footnotes
1. Petitioners appeared pro se at the trial. They retained counsel after trial to prepare their post-trial briefs. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
3. On brief petitioners argue that the agreement to furnish Composite's requirements for NUF "at his [Mr. Dietrick's] cost" somehow included some amount for profit. There is no evidence in the record to support that argument. ↩
4. At trial petitioner characterized these payments as having been made to Composite, suggesting that Alther performed the services for Dietrick Sales and Service as an agent of Composite. Consistent with that theory, petitioner also testified that Composite reported the payments from Dietrick Sales and Service to Alther as income on its corporate return. That is not the fact. On its 1980 corporate income tax return, Composite reported as income only the $ 12,865.44 interest income on the funds held in savings accounts and Treasury bills. While it did not report any income from these services performed by Alther, Composite did file Employer's Quarterly Federal Tax Returns (Forms 941) for that year. ↩
5. Composite's 1981 corporate tax return reflected total gross income of only $ 13,812.21 and a deduction for wages of $ 5,728.70. ↩
6. Presumably this is part of the total gross receipts of $ 189,499.26 reported by Composite on its 1982 corporate tax return and the $ 110,762.58 deducted for rental expenses that year. It is not clear whether the $ 110,762.58 was reported as income on petitioner's Schedule C or on the corporate return of either Dietrick Sales and Service or Tailwinds Aviation which had been incorporated in early 1982. ↩
7. The $ 160,800 characterized in the January 1981 Offering Circular as a "loan" to petitioner represented the total capital contributions received from the first two stock offerings. ↩
8. The parties have stipulated that these various Account 22 amounts were as follows: ↩
$  36,022.20
Wages & withholding taxes for Alther
69,346.91
Travel, Engineering, etc.
5,591.76
Consultants
14,552.64
Life insurance
8,230.16
Legal fees
3,894.64
Advertising
Total
$ 137,638.31
9. In addition to disallowing certain other advertising and depreciation expenses, the nature of which is not explained by the record, respondent disallowed Account 22 expenditures as follows: Account 22 Amount (See n.8, supra)
Amount Disallowed
$  36,022.20
Respondent actually disallowed $ 40,000 for labor. The record does not explain this discrepancy of $ 3,977.80. * $  36,022.20
69,346.01
Respondent allowed $ 18,146.91 for Midland Office expense and $ 3,000 for supplies, apparently as expenses of the sole proprietorship. **    48,200.00
5,591.76
5,591.76
14,552.64
14,552.64
8,230.16
Respondent allowed half of this legal expense, apparently as an expense by the sole proprietorship. ***↩     4,115.08
3,894.64
3,894.64
Total
$ 137,638.31
$ 112,376.32
10. In addition to other adjustments to petitioner's 1981 tax return, respondent disallowed the following Account 22 expenditures: ↩
$ 20,050.45
Alther's wages
11,915.39
Consultants
2,665.05
Withholding taxes
29,843.45
Midland expenses (including $ 9,600 rent)
1,717.19
Advertising
1,129.84
Legal and professional
3,638.16
Life insurance
$ 70,959.53
11. In pertinent part, section 162 provides as follows: (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including -- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; (2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; and (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. ↩
12. Representing themselves during trial, petitioners essentially disregarded the fact that Mr. Dietrick's corporation, Composite Aircraft, is a legal entity separate and apart from Mr. Dietrick or his sole proprietorship. Mr. Dietrick argued that he should be able to deduct the corporation's expenses because he was working for Composite without compensation and the "only compensation I get from it is through my Schedule C" [i.e., offsetting corporate expenses against his income from other sources]. He further argued that the corporate expenses were deductible by him on his personal returns because they somehow represented the expenses of "splitting out" Composite and later two other corporations from his sole proprietorship. As he explained it, "in my mind, my Schedule C was actually giving birth to these three companies." We note, however, that Mr. Dietrick's sole proprietorship [his "Schedule C" as he called it] was not in the trade or business of promoting corporate enterprises. See, for example, Townshend v. United States,384 F.2d 1008, 1011-1013↩ (Ct. Cl. 1967). Retained only to brief the case, petitioners' counsel wisely abandoned these untenable arguments and relied upon a plausible legal theory. He presented that theory in well-reasoned, carefully crafted briefs that suffered only from inadequate factual support in the record. 13. See also Modell v. Commissioner,T.C. Memo. 1983-761; Holman v. Commissioner,T.C. Memo. 1973-279; Jones Beach Theatre Corp. v. Commissioner,T.C. Memo. 1966-100↩. 14. See also H. Kalicak Construction Co. v. Commissioner,T.C. Memo 1984-552; Modell v. Commissioner,T.C. Memo. 1983-761↩. 15. To a minor extent in 1981 and in 1982 and subsequent years, Alther's engineering services rendered under the name of "Alther Engineering" apparently produced income that was deposited into Composite's corporate account, and used to pay at least part of Alther's salary and expenses. However, the only Alther wages in dispute in this case are those amounts paid by Mr. Dietrick in 1980 and 1981. See nn. 4,5,8,9,10, supra.↩
16. For 1980, respondent disallowed $ 112,376.32 of the Account 22 expenses that petitioner deducted on his Schedule C for that year, including the $ 36,022.20 for Alther's wages and withholding taxes. See n.9, supra.↩ For 1981, respondent disallowed $ 70,959.53 of the Account 22 expenses that petitioner deducted on his Schedule C for that year, including the $ 20,050.45 for Alther's wages for that year. Thus, respondent disallowed total Account 22 expenses of $ 183,335.85 ($ 112,376.32 + $ 70,959.53), but at most petitioner received net reimbursements of only $ 135,800 (the total so-called "loans" of $ 160,800 less the $ 25,000 portion he repaid of the $ 65,000 transfer). Accordingly, there were disallowed Account 22 expenditures of at least $ 47,535.85 ($ 183,335.85 - $ 135,800) for which petitioner received no reimbursement from Composite. Thus, 90 percent of the wages and any withholding taxes petitioner paid for Alther's services, up to a maximum of $ 47,535.85, would be a deductible expense on petitioner's Schedule C. However, it appears that the total fund transfers in 1980 exceeded the disallowed Account 22 expenses that year, so a deduction would be allowable only for 90 percent of the $ 20,050.45 wage payment in 1981. The parties' Rule 155 computation will determine whether or not that results in a change in the tax liability for 1982, the year before the Court.