T.C. Memo. 2017-36

UNITED STATES TAX COURT

JASON M. SCHEURER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25308-14.            Filed February 21, 2017.

Jason M. Scheurer, pro se.

<u>Rachel G. Borden</u> and <u>Warren P. Simonsen</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>: With respect to petitioner's Federal income tax for 2009 and 2010, the Internal Revenue Service (IRS or respondent) determined deficiencies, an addition to tax, and penalties as follows:[1]

_____

[1]All statutory references are to the Internal Revenue Code in effect for the
(continued...)

[*2]

| Year | Deficiency | Addition to tax sec. 6651(a)(1) | Penalty sec. 6662(a) |
|------|-----------|------------------|-----------|
| 2009 | $44,607 | $12,343 | $8,921 |
| 2010 | 3,873 | -0- | 775 |

After concessions,[2] the issues for decision are whether petitioner for 2009 is entitled, by virtue of certain alleged advances of funds, to either a business bad debt deduction or a partnership loss deduction. We hold that he is entitled to neither.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated by this reference. Petitioner resided in Virginia when he petitioned this Court.

---

[1](...continued) years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[2]For 2009 petitioner concedes that he: (1) received $55,702 of taxable wages ($46,431 of which he incorrectly reported on a Schedule C, Profit or Loss From Business), (2) is not entitled to deductions in the aggregate amount of $20,552 as claimed on that Schedule C, and (3) is liable for an addition to tax and (to the extent the deficiency is sustained) an accuracy-related penalty as set forth in the notice of deficiency. For 2010 petitioner concedes that he: (1) received $73,342 of taxable wages ($57,134 of which he incorrectly reported on a Schedule C), (2) is not entitled to deductions in the aggregate amount of $33,339 as claimed on that Schedule C, and (3) is liable for an accuracy-related penalty as set forth in the notice of deficiency. For 2009 and 2010 respondent concedes that petitioner is entitled to miscellaneous deductions of $14,232 and $29,548, respectively, for "other expenses" on Schedule A, Itemized Deductions. All other adjustments (apart from those discussed in the text) are computational.

**[*3]**  During 2009 petitioner worked full time as a financial adviser.  For part of the year he was employed by Wachovia Shared Resources and Raymond James Financial Services.  He subsequently worked for both firms as an independent contractor.

The tax deficiency in dispute grows out of petitioner's involvement with Continental Financial Services (CFS), a Florida sole proprietorship formed by Kevin Zinn.  Petitioner had known Mr. Zinn for more than 20 years, and they were good friends.  Petitioner was the best man in Mr. Zinn's wedding.

CFS originally operated a call center business selling various products and services.  Sometime in 2008 it moved to a new location in Florida and started a "robocall" operation that employed 30 to 40 workers.  Using "robocalling" equipment, CFS contacted consumers with heavy credit card debt that bore high interest rates.  In exchange for an upfront fee, CFS offered to negotiate with the consumer's bank in an effort to reduce the interest rate.  If the consumer accepted this offer, CFS would charge its fee to the consumer's credit card.

In order to charge its fees to consumers' credit cards, CFS needed to have "merchant accounts" with one or more banks.  Because Mr. Zinn had very poor credit, neither he nor CFS could secure a merchant account with any bank.  Mr.

[*4] Zinn accordingly sought assistance from petitioner, who agreed to use his superior credit to help open merchant accounts on behalf of CFS.

Toward this end, petitioner and Louis Jasikoff in October 2008 formed Jasikoff Consulting LLC (JC). The partnership agreement provided that petitioner would be a 90% partner and Mr. Jasikoff a 10% partner. Petitioner was to be solely responsible for financing JC, and Mr. Jasikoff was to be responsible for day-to-day operations, including preparing financial statements and tax returns. The partnership agreement stated that JC was being formed for the purpose of "providing merchant processing services primarily for, but not limited to, [CFS]."

During 2008 and 2009 JC set up merchant accounts with banks in four countries, including China and the Philippines. When CFS charged a fee to a consumer's credit card, the payment would be remitted to one of those banks. The bank would deduct its usual processing charge; hold 10% of the payment in reserve for six months to account for potential refund claims; and send the net amount to JC. JC would send this net amount to CFS and, after the six-month hold was released, retain the 10% reserve amount as its profit. JC did not set up merchant accounts for, or perform merchant processing services for, any entity other than CFS.

**[*5]** CFS began to experience financial problems soon after commencing the "robocall" operation. Mr. Zinn did not have sufficient capital to fund this operation, and he sought financial assistance from petitioner. Petitioner contends that he agreed to provide assistance and that he caused funds to be transferred to CFS in two ways.

First, petitioner alleges that his girlfriend at the time, Jennifer Soden, made wire transfers during 2009 from her personal bank account to CFS in the aggregate amount of $84,000. But she testified that she did not know whether this money went to petitioner, JC, or CFS. Her bank account statements evidence these transfers; but neither she nor petitioner could establish that the account numbers to which the funds were wired belonged to CFS. Ms. Soden clearly advanced these funds to petitioner or on his behalf, because petitioner's father eventually provided Ms. Soden with enough money to make her whole. But there is no evidence, apart from petitioner's testimony, that this $84,000 was actually received by CFS.

Second, petitioner alleges that most of the debits to JC's bank account during 2009 represented loans to CFS. But at least $19,800 of these debits represented payments to Ms. Soden and at least $22,600 represented payments to petitioner; many other debits represented payment of Mr. Jasikoff's expenses. Most of the other large debits appeared to be amounts that JC remitted to CFS pursuant to its

[*6] "merchant processing" activity. Mr. Jasikoff credibly testified that on at least one occasion he withdrew cash from JC's bank account, hand-carried it to Florida, and distributed it to CFS employees when Mr. Zinn could not make payroll. The record includes signed releases from CFS employees evidencing receipt of $19,842 from Mr. Jasikoff.

CFS' financial situation continued to worsen as the financial crisis took its toll. Petitioner and JC ended their involvement with CFS sometime after 2009. JC apparently continued to exist, at least in form, through 2013.[3]

Petitioner filed a delinquent individual income tax return for 2009 on August 26, 2011. On this return he claimed, on Form 4797, Sale of Business Property, a business bad debt deduction of $122,856 attributable to funds he had allegedly advanced (directly or through Ms. Soden) to CFS, which CFS allegedly had not

---

[3]Mr. Zinn was incarcerated at the time of trial with an anticipated release date no earlier than 2019. Petitioner sought to introduce into evidence an affidavit from Mr. Zinn, notarized by a prison official, that described in general terms the business relationship between JC and CFS. Respondent objected on hearsay grounds, and we took this objection under advisement. Petitioner stated that the sole purpose of the affidavit was to establish the arrangement between JC and CFS during 2009. We conclude that the terms of that arrangement were established by the documentary evidence and the testimony of petitioner, Mr. Jasikoff, and a former CFS employee. Because Mr. Zinn's affidavit is cumulative of the existing evidence, we will sustain respondent's objection to its admissibility.

[*7] repaid. He did not report on that return any income, expenses, or other pass-through items from JC.

The IRS selected for examination petitioner's delinquent 2009 return and his timely filed 2010 return. For 2009 the IRS disallowed the business bad debt deduction in full and determined an addition to tax and an accuracy-related penalty. The IRS issued petitioner a timely notice of deficiency for both years, and on October 24, 2014, he timely petitioned this Court.

Four days later, on October 28, 2014, JC filed a delinquent Form 1065, U.S. Return of Partnership Income, for 2009. On this return it reported a loss of $219,598, which was attributable in large part to claimed "prepaid expenses" in excess of $170,000. These "prepaid expenses" corresponded to funds that petitioner allegedly had advanced (directly or indirectly) to CFS to cover its payroll and other operating expenses, i.e., the same advances that formed the basis for the bad debt deduction claimed on petitioner's individual return for 2009.

Petitioner contends that he is entitled to deduct for 2009 his 90% share of JC's supposed partnership loss, or $197,368. The record includes a copy of a Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., allegedly issued by JC to petitioner for 2009. However, petitioner submitted no evidence to substantiate the claimed partnership loss apart from the testimony and

**[*8]** documentary evidence (discussed above) relating to his alleged advances of funds to CFS.

OPINION

The IRS' determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The taxpayer bears the burden of proving his entitlement to deductions allowed by the Code and of substantiating the amounts of expenses underlying claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), Income Tax Regs. Under certain circumstances the burden of proof on factual issues may shift to respondent. See sec. 7491(a)(1). But petitioner introduced little if any "credible evidence," sec. 7491(a)(1), and he did not "maintain[] all records required" by the Code, sec. 7491(a)(2)(B). He thus bears the burden of proof.

A.    Business Bad Debt Deduction

Section 166(a)(1) provides that "[t]here shall be allowed as a deduction any debt which becomes [wholly] worthless within the taxable year." For a nonbusiness bad debt held by a taxpayer other than a corporation, section 166(a)(1) does not apply, and the taxpayer is allowed a short-term capital loss for the taxable year

**[*9]** in which the debt becomes completely worthless.  Sec. 166(d)(1); sec. 1.166-5(a)(2), Income Tax Regs.

Section 166(d)(2) defines a business debt as "a debt created or acquired * * * in connection with a trade or business of the taxpayer" or "a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." To be eligible to deduct a loss as a business bad debt, a taxpayer must show that he was engaged in a trade or business and that the debt was proximately related to his trade or business.  Putoma Corp. v. Commissioner, 66 T.C. 652, 673 (1976), aff'd, 601 F.2d 734 (5th Cir. 1979); sec. 1.166-5(b), Income Tax Regs.  To be engaged in a trade or business, the taxpayer must participate in the activity with continuity and regularity, and his primary purpose for engaging in the activity must be for income or profit.  Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).  The management of one's investments, no matter how extensive, is not a "trade or business."  Whipple v. Commissioner, 373 U.S. 193, 200 (1963).

For three distinct reasons, we conclude that the IRS correctly disallowed the $122,856 business bad debt deduction that petitioner claimed on his 2009 return.  First, petitioner failed to substantiate that he advanced $122,856 to CFS.  We did not find petitioner to be a particularly credible witness; and there is no evidence, apart from his testimony, that CFS actually received any portion of the $84,000

**[*10]** wired from Ms. Soden's bank account. Petitioner likewise failed to carry his burden of proving that the debits to JC's bank account constituted loans to CFS (as opposed to "merchant processing" remittances to CFS or payments to Mr. Jasikoff, Ms. Soden, or petitioner). We find that the maximum amount of advances to CFS that petitioner has substantiated is $19,842, the sum of the receipts that Mr. Jasikoff got from CFS employees for payment of wages.

Second, petitioner did not carry his burden of proving that his advances to CFS (such as they were) created bona fide indebtedness. A bona fide debt is a debt arising from "a debtor-creditor relationship based on a valid and enforceable obligation to pay a fixed or determinable sum of money." Kean v. Commissioner, 91 T.C. 575, 594 (1988); sec. 1.166-1(c), Income Tax Regs. Whether an advance of funds gives rise to a bona fide debt for tax purposes is determined from all the facts and circumstances. See A.R. Lantz Co. v. United States, 424 F.2d 1330, 1333 (9th Cir. 1970); Road Materials, Inc. v. Commissioner, 407 F.2d 1121, 1126 n.2 (4th Cir. 1969), aff'g in part, vacating in part T.C. Memo. 1967-187; Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980). "A gift or contribution to capital shall not be considered a debt for purposes of section 166." Sec. 1.166-1(c), Income Tax Regs.; see Wood Preserving Corp. v. United States, 347 F.2d 117, 118 (4th Cir. 1965).

**[\*11]** In determining whether an advance of funds constitutes a bona fide debt, "economic reality provides the touchstone." Shaw v. Commissioner, T.C. Memo. 2013-170, at \*10; see Davis v. Commissioner, 69 T.C. 814, 835 (1978) ("[W]hether the advances \* \* \* are debt or equity depends on the economic substance of the transactions."). If a third-party lender would not have lent funds on the same terms, an inference arises that the advance is not a true loan. See Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968). An important factor in deciding the character of an advance is whether the purported creditor expects that the amount will be repaid. See CMA Consol., Inc. v. Commissioner, T.C. Memo. 2005-16, 89 T.C.M. (CCH) 701, 724. Advances made to an insolvent debtor generally do not create debts for tax purposes but are characterized as capital contributions or gifts. See Road Materials, Inc., 407 F.2d at 1125 (listing "doubtful prospects of repayment" as an important factor in deciding whether an unconditional obligation to repay exists); Dixie Dairies Corp., 74 T.C. at 497; Davis, 69 T.C. at 835-836.

There is no evidence to support petitioner's contention that any funds he advanced to CFS gave rise to a bona fide loan. There was no promissory note, no fixed or determinable amount due, no specified interest rate, no principal due date, and no requirement of security. See Bauer v. Commissioner, 748 F.2d 1365,

[*12] 1368-1371 (9th Cir. 1984), rev'g T.C. Memo. 1983-120; Estate of Mixon v. United States, 464 F.2d 394, 402-405 (5th Cir. 1972); CMA Consol. Inc., 89 T.C.M. (CCH) at 713-715. It seems obvious that no bank would have lent money to Mr. Zinn or CFS in 2009. Indeed, the reason that Mr. Zinn sought "merchant processing" assistance from petitioner was that his credit was too poor to enable him to open merchant accounts himself.

The only advances to CFS that petitioner substantiated were Mr. Jasikoff's payment of wages to its employees when Mr. Zinn could not make payroll. But if Mr. Zinn could not pay his debts as they became due, he was very likely insolvent. Because the prospects of repayment from an insolvent person are quite doubtful, this fact strongly suggests that Mr. Jasikoff's $19,842 advance did not give rise to bona fide debt. See Road Materials, Inc., 407 F.2d at 1125. Evaluating all of the evidence and testimony in light of the relevant factors, we conclude that petitioner's advances of funds to CFS, to the extent he substantiated them, did not constitute bona fide debt.

Third, even if petitioner could prove that his advances to CFS created bona fide indebtedness, he did not prove that the debt was a "business bad debt" qualifying for deduction under section 166(a)(1). A loss is deductible as a business bad debt only if the taxpayer is in a "business" and the debt in question is proximately

**[\*13]** related to that business.  United States v. Generes, 405 U.S. 93, 96 (1972); Dagres v. Commissioner, 136 T.C. 263, 282 (2011).  To determine whether a loss is proximately related to the taxpayer's business, we evaluate his dominant motive for making the loan.  Generes, 405 U.S. at 103.

We conclude that petitioner has failed to show that the advances, to the extent substantiated, became business bad debts under section 166.  Petitioner was not engaged in the trade or business of lending money during 2009.  He worked full time during that year as a financial adviser, and there is no evidence that he ever lent money to anyone else.  We find no evidentiary support for the proposition that his alleged loan to CFS was "a debt created or acquired * * * in connection with a trade or business" of lending money in which he was engaged during 2009.  See sec. 166(d)(2)(A).  Nor was any alleged loan "incurred in the taxpayer's trade or business," namely, petitioner's occupation as a financial adviser.  See sec. 166(d)(2)(B).

We find that petitioner's dominant motivation for advancing funds to CFS was personal, stemming from his longtime friendship with Mr. Zinn.  He was fully aware that Mr. Zinn had very poor credit, and it is highly unlikely that he would have advanced funds under these circumstances unless Mr. Zinn had been a close personal friend.  Because petitioner's primary motivation for advancing funds was

[*14] personal, we find that the advances, to the extent substantiated, were not proximately related to any business in which petitioner during 2009 was engaged.

B.     Partnership Loss

In his post-trial briefs petitioner largely abandoned his claim to a business bad debt deduction and instead claimed entitlement to deduct his share of a partnership loss allegedly incurred by JC.  On its delinquent Form 1065 for 2009, filed in October 2014, JC reported gross receipts of $530,474 (representing its receipts from the "merchant accounts") and cost of goods sold of $503,658 (representing its net payments to CFS).  JC reported an overall loss of $219,598, attributable largely to claimed "prepaid expenses" in excess of $170,000.  These "prepaid expenses" corresponded to the funds that petitioner or JC had allegedly advanced to CFS to cover its payroll and other operating expenses, i.e., the same advances that formed the basis for the bad debt deduction that petitioner claimed on his individual return.  He contends that he is entitled to deduct his 90% share of JC's supposed partnership loss, or $197,368.[4]

In support of this theory petitioner asserts that JC was in the "robocalling" trade or business; that JC hired CFS as an "independent contractor" to operate this

---

[4]In his post-trial briefs, petitioner contends that the partnership loss deduction to which he is entitled is $172,163, representing the advances to CFS that he claimed to have substantiated.

[*15] business; and that JC, in advancing funds to CFS, was defraying "prepaid expenses" of its own "trade or business." This argument initially suffers from the same flaw as petitioner's bad debt argument, namely, lack of substantiation. As discussed previously, petitioner substantiated at most $19,842 of advances to CFS, and he substantiated none of JC's other expenses.

More fundamentally, there is no evidentiary support for petitioner's characterization of the relationship. JC clearly was not in the "robocalling" trade or business; that business was conducted exclusively by CFS and its 30 to 40 employees. The partnership agreement between petitioner and Mr. Jasikoff stated that the partnership was being formed for the purpose of "providing merchant processing services primarily for, but not limited to, [CFS]." The agreement recited no other purpose, and "merchant processing" was the only business that JC ever conducted. Petitioner thus has the relationship precisely backwards: It was CFS that hired JC as an independent contractor to act as CFS' agent in setting up merchant accounts to facilitate CFS' "robocalling" business.

In short, when Mr. Jasikoff expended $19,842 from JC's bank account to defray CFS' payroll costs, JC was not paying its own expenses. Rather, it was paying CFS' expenses, and petitioner admitted that JC was under no obligation to do this. The rule is well established that a taxpayer such as JC generally cannot

**[*16]** deduct the expenses of a third party such as CFS. See Deputy v. du Pont, 308 U.S. 488, 494 (1940); Reading Co. v. Commissioner, 132 F.2d 306, 311 (3d Cir. 1942). JC's voluntary payment is best characterized as a capital contribution or as a gift to CFS motivated by petitioner's friendship with Mr. Zinn. JC's voluntary payment to CFS is not a valid partnership expense of JC that could give rise to a net partnership loss that could flow through to petitioner.

There is a narrow exception to the rule that a taxpayer cannot claim a deduction for paying a third party's expenses. That exception applies where: (1) the taxpayer's motive for paying the other's obligation is to protect or promote the taxpayer's own business and (2) the expenditure is an "ordinary and necessary expense" of the taxpayer's business. Lohrke v. Commissioner, 48 T.C. 679, 688 (1967); Fargo v. Commissioner, T.C. Memo. 2015-96, at *26; Dietrick v. Commissioner, T.C. Memo. 1988-180, 55 T.C.M. (CCH) 706, 711-712, aff'd, 881 F.2d 336 (6th Cir. 1989).

Petitioner did not carry his burden of proving that JC's motive for defraying CFS' payroll expenses was to promote JC's own business. Petitioner's strong personal motivation for helping Mr. Zinn greatly suggests that this advance was a gift or capital investment, not a business expense. And CFS' dire financial situation made it unlikely that JC would have an ongoing "merchant processing" business to

**[\*17]** promote.  See Dietrick, 55 T.C.M. (CCH) at 711-712.  Because petitioner has not established that JC's motive for paying CFS' expenses was to protect or promote its own business, we need not address whether the expenses were ordinary and necessary expenses of JC's business.  We conclude that petitioner is not entitled to any partnership loss deduction for 2009 because he did not prove the existence or amount of such a loss.[5]

To reflect the foregoing and the concessions of the parties,

Decision will be entered under<br>Rule 155.

---

[5]Respondent contends that any partnership loss passed through to petitioner from JC would be a "passive activity" loss, nondeductible under section 469(a), because petitioner did not "materially participate" in JC's trade or business.  See sec. 469(c)(1)(B).  In view of our disposition we need not address this alternative argument.